Barry I. Levy, Esq.
Michael Vanunu, Esq.
Colleen O'Neil, Esq.
Allison Stapleton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

          Plaintiffs,

   -against-

TRISTATE PSYCHOLOGICAL INJURY SERVICES, P.C.,
SCOTT LLOYD, PH.D. (A Sole Proprietorship), SCOTT
LLOYD, PH.D., GARY GRODY a/k/a LANCE GRODY,
and JOHN DOE DEFENDANTS "1" - "10",
           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (  )

**Plaintiff Demands a Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

## NATURE OF THE ACTION

  1.  This action seeks to recover more than $520,000.00 that the Defendants wrongfully

obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent,

unlawful, and otherwise non-reimbursable no-fault insurance charges for purported psychology services, including psychiatric diagnostic evaluations, neurobehavioral status exams, psychological testing, neuropsychological testing, psychotherapy sessions, and record reviews (the "Fraudulent Services"). The Fraudulent Services purportedly were provided to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay more than $675,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Defendants Tristate Psychological Injury Services, P.C. ("Tristate PC") and Scott Lloyd, Ph.D. (a Sole Proprietorship)("SLSP" and collectively with Tristate PC, the "Lloyd Entity Defendants") because:

(i)      the Defendants were not in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)     the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)    the Fraudulent Services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)     the billing codes used by the Defendants to seek payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided to inflate the charges submitted to GEICO and other New York automobile insurers; and

(v)      the Fraudulent Services were provided, to the extent provided at all, by "social workers" who, to a large extent, were unlicensed and not under the

supervision of any licensed individual in contravention of New York law, and were never employed by the Lloyd Entity Defendants.

3.    Specifically, the Defendants' scheme can be summarized as follows:

(i)    beginning in or around May 2019, Defendant Gary Grody a/k/a Lance Grody ("Grody") and the John Doe Defendants "1" – "10" (the "John Doe Defendants") associated and recruited Defendant Scott Lloyd, Ph.D. ("Lloyd"), a licensed psychologist who, in exchange for compensation, agreed to permit Grody and the John Doe Defendants to use his name and professional license to fraudulently incorporate Tristate PC and then use Tristate PC as a vehicle through which to submit fraudulent claims seeking payment for no-fault reimbursement to New York automobile insurers, including GEICO;

(ii)    less than a year and a half later, in September 2020, Tristate PC ceased "operations", and a few months later, in January 2021, Lloyd permitted Grody and the John Doe Defendants to secure a tax identification number for SLSP and then use Lloyd's name and professional license to submit fraudulent claims seeking payment for no-fault reimbursement through SLSP to New York automobile insurers, including GEICO;

(iii)    at or around the time when Tristate PC became "operational", Grody and the John Doe Defendants:

(a)    established illegal referral and kickback arrangements between the Lloyd Entity Defendants and the owners and/or managers of more than fifteen (15) clinics located throughout the New York metropolitan area that specialized in "treating" patients with no-fault insurance who claimed to have been injured in automobile accidents (the "Clinics");

(b)    arranged to have most, if not all, of the Fraudulent Services performed at the Clinics by unlicensed "social workers" who were never employed by the Lloyd Entity Defendants and pursuant to a predetermined protocol designed to maximize billing for the Fraudulent Services;

(c)    arranged to have Lloyd and the Lloyd Entity Defendants enter into various "funding" agreements pursuant to which money was advanced against the account receivables associated with the Fraudulent Services, which money was then used by Grody and the John Doe Defendants to fund the scheme – including paying the requisite kickbacks to the Clinics and providing nominal compensation to the unlicensed "social workers" in exchange for their performance of the Fraudulent Services; and

3

(d)     arranged for virtually all the monies payable to the Lloyd Entity Defendants by insurance companies, including GEICO, as a result of the submission of the fraudulent claims, to be transferred/assigned to various shell companies owned by Grody, the John Doe Defendants, and others, ultimately providing Grody and the John Doe Defendants with total and exclusive control over the claims;

(iv)    accordingly, though nominally owned on paper by Lloyd, a licensed psychologist, the Lloyd Entity Defendants were unlawfully and secretly owned, operated, and controlled by Grody and the John Doe Defendants.

4.     As set forth herein, the Defendants, at all relevant times, have known that:

(i)     the Defendants were not in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)    the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)   the Fraudulent Services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    the billing codes used by the Defendants to seek payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided to inflate the charges submitted to GEICO; and

(v)     most, if not all, of the Fraudulent Services were provided, to the extent provided at all, by unlicensed "social workers" who were not under the supervision of any licensed individual in contravention of New York law and were never employed by the Lloyd Entity Defendants.

5.     As such, the Defendants are not and have never been eligible to be compensated for the bills they submitted to GEICO through the Lloyd Entity Defendants.

6.      The charts annexed hereto as Exhibits "1" and "2" summarize, in part, the fraudulent charges identified to date that the Defendants have submitted, or caused to be submitted, through Tristate PC and SLSP, respectively, to GEICO, using the United States mails.

7.      The Defendants' fraudulent scheme began no later than 2019 and has continued uninterrupted since that time as the Defendants continue to pursue collection against GEICO on the Fraudulent Services through the prosecution of lawsuits and arbitrations.

8.      As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $520,000.00.

## THE PARTIES

### I.      Plaintiffs

9.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.      Defendants

10.      Defendant Grody resides in and is a citizen of New York. Grody holds himself out to the public to be a licensed clinical psychologist. In fact, Grody is a convicted felon who is not licensed to practice psychology or any other profession in the State of New York. Grody is uniquely familiar with how to manipulate New York's no-fault system to defraud insurance companies out of money for the financial benefit of himself and those with whom he associates.

11.      In 2002, Grody was indicted in the Eastern District of New York and ultimately pleaded guilty in 2003 to three (3) separate counts in connection with a previous insurance fraud scheme, which resulted in him: (i) being imprisoned for more than a year and serving a supervised

release for a period of three years; and (ii) paying restitution to Allstate Insurance Company of more than $280,000.00.

12.    Shortly after Grody was released from federal imprisonment, he became involved in a series of fraudulent insurance schemes that resulted in at least four (4) major automobile insurance companies filing a series of civil recovery actions against him and various others, with more than $10 million in judgments ultimately being entered against him. Based on the relevant court records, those judgments remain unsatisfied to date, and Grody remains incapable of openly operating within the healthcare industry or engaging in any legitimate activity, thereby contributing to his motive to engage in the furtive, fraudulent, and unlawful conduct described herein.

13.    Defendant Lloyd resides in and is a citizen of New York. At all relevant times, Lloyd was a registered clinical psychologist who purported to provide, or directly supervise, virtually all the Fraudulent Services that were billed to GEICO through the Lloyd Entity Defendants.

14.    Defendant Tristate PC is a New York psychology services professional corporation with its principal place of business in New York. Tristate PC was incorporated in New York on or about February 2, 2019, was purportedly owned and controlled by Lloyd, and was used as a vehicle to submit fraudulent billing to insurance companies, including GEICO.

15.    Defendant SLSP is an unincorporated psychology practice with its principal place of business in New York. SLSP commenced operations on or about January 25, 2021, was purportedly owned and controlled by Lloyd, and was used as a vehicle to submit fraudulent billing to insurance companies, including GEICO.

16.    The John Doe Defendants are citizens of New York. The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with Grody, Lloyd, and the Lloyd Entity Defendants and derived financial benefit from the fraudulent scheme.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

18.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

20.    GEICO underwrites automobile insurance in New York.

**I.    An Overview of the Pertinent Law Governing No-Fault Reimbursement**

21.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§

65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

23.    An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

24.    Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

25.    Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

27.    In New York, only a licensed psychologist may: (i) practice psychology; (ii) own or control a psychology practice; (iii) employ and supervise other psychologists; and (iv) absent

statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

28.    Unlicensed non-psychologists may not: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

29.    New York law prohibits licensed healthcare services providers, including psychologists, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

30.    New York law prohibits unlicensed persons not authorized to practice a profession, like psychology, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

31.    Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or it allows unlicensed laypersons to share in the fees for the professional services.

32.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, (ii) only licensed practitioners may practice their profession in New York because of the concern that unlicensed persons are not bound by "ethical rules" that govern the quality of care; and (iii) insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

33.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

34.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

35.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

36.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

37.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Defendants' Fraudulent Scheme

### A.    The Origin of the Defendants' Fraudulent Scheme and its Components

38.    Beginning in 2019 and continuing through the present, Grody and the John Doe Defendants masterminded and implemented a complex fraudulent scheme pursuant to which they established Tristate PC and SLSP, in succession, through the unlawful use of Lloyd's name and professional license, and then used the Lloyd Entity Defendants to bill GEICO more than $1,284,000.00 for unnecessary, illusory, and otherwise non-reimbursable psychology services. In a "quick hit" fashion, the Defendants submitted billing for the Fraudulent Services through Tristate PC from May 2019 to July 2019 and from May 2020 to September 2020, and then, through SLSP from January 2021 to July 2021.

39.    In the broader context, the Lloyd Entity Defendants are but two of numerous high-volume no-fault "practices" that Grody and the John Doe Defendants have unlawfully owned and operated, including the psychology "practices" that have been named in the following recently filed federal lawsuits, GEICO v. Tenenbaum, et al., Case No. 1:22-cv-04543 (ARR)(PK)(EDNY 2022), GEICO v. Polino, et al., Case No. 1:22-cv-05178 (CBA)(VMS)(EDNY 2022), GEICO v. Stallings, et al., Case No. 1:22-cv-03606 (DG)(RML)(EDNY 2022), GEICO v. Bily-Linder, et al., Case No. 1:23-cv-00515 (FB)(RML)(EDNY 2022), and GEICO v. Gepp, et al., Case No. 1:22-cv-02860 (ARR)(MMH)(EDNY 2022).

### 1.    The Solicitation of Lloyd and the Unlicensed "Social Workers"

40.    To be able to submit the large amounts of billing for the Fraudulent Services to New York automobile insurers, including GEICO that Grody and the John Doe Defendants intended, they first needed to: (i) obtain access to the professional license and signature of a New York psychologist; and (ii) recruit "workers" who would purport to perform the Fraudulent Services.

41.    Accordingly, Grody recruited Lloyd, who, in exchange for compensation, was willing to permit Grody and the John Doe Defendants to unlawfully establish the Lloyd Entity Defendants through the misappropriation of his name and professional license and then use the Lloyd Entity Defendants as vehicles through which to submit large scale fraudulent billing to insurers, including GEICO.

42.    In addition, Grody recruited the predominantly unlicensed "social workers" to purport to perform the Fraudulent Services on behalf of the Lloyd Entity Defendants at the Clinics, in exchange for nominal payment. This was done, in part, by Grody conducting searches seeking the assistance of people who had recently graduated from school or who had practical experience but could not become licensed in New York for various reasons.

43.    Once an unlicensed "social worker" was recruited, Grody would arrange to have that individual meet him at one of the Clinics. During the meeting, Grody would explain that the position required the individual to travel to various medical clinics to see people who had been in automobile accidents and to ask those people a series of questions and provide them with forms to complete. Grody told the unlicensed "social workers" they would be paid a day rate for each day that they travelled to the medical clinics and that their work at the medical clinics would be supervised by a licensed psychologist. In fact, supervision by a licensed psychologist never

happened. Rather, nearly all the people with whom the unlicensed "social workers" ever had contact at the medical clinics, outside of the patients themselves, worked for Grody and were not licensed psychologists.

## 2. Gaining Access to Insureds

44. In addition to the recruitment of Lloyd and the unlicensed "social workers", the success of the Defendants' fraudulent scheme required Grody and the John Doe Defendants to gain access to a large volume of Insureds to whom the unlicensed "social workers" could purport to provide the Fraudulent Services.

45. However, neither of the Lloyd Entity Defendants was set up to generate its own stand-alone patient base. Indeed, neither of the Lloyd Entity Defendants had any legitimate indicia of a healthcare practice, i.e., they (i) had no fixed treatment locations beyond those from which they operated on an itinerant basis; (ii) did not maintain any stand-alone practices; (iii) were not the owners or leaseholders in any of the locations from which the Fraudulent Services were allegedly performed; (iv) did not employ any of their own support staff; and (v) did not advertise or market any of their services to the general public.

46. Instead, Grody and the John Doe Defendants obtained access to Insureds for the Lloyd Entity Defendants and the unlicensed "social workers" through the payment of kickbacks or other financial incentives to the owners/operators of the Clinics and/or to other individuals associated with the Clinics.

47. These Clinics, include, but are not limited to, the clinics located at the following locations:

| CLINIC LOCATIONS | | |
|---|---|---|
| 14 No. Main Street | Spring Valley | NY |
| 148-21 Jamaica Avenue | Jamaica | NY |
| 2184 Flatbush Avenue | Brooklyn | NY |
| 245 Rockaway Avenue | Valley Stream | NY |
| 2488 Grand Concourse | Bronx | NY |
| 320 Post Avenue | Westbury | NY |
| 3250 Westchester Avenue | Bronx | NY |
| 33-10 101st Street | Flushing | NY |
| 332 East 149th Street | Bronx | NY |
| 4041 Boston Road | Bronx | NY |
| 55 East 115th Street | New York | NY |
| 60 Belmont Avenue | Brooklyn | NY |
| 6269 99th Street | Queens | NY |
| 647 Bryant Avenue | Bronx | NY |
| 90-16 Sutphin Boulevard | Jamaica | NY |

48.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics were organized to supply convenient, one-stop shops for no-fault insurance fraud.

49.     The Clinics provided facilities for the Lloyd Entity Defendants, as well as a "revolving door" of other psychology providers, healthcare services providers, chiropractic providers, physical therapy providers, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

50.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

51.     The Clinics were willing and able to provide the Lloyd Entity Defendants with access to a large amount of Insureds in exchange for kickbacks or other financial incentives

because the Clinics' raisons d'être was to profit from the "treatment" of individuals covered by no-fault insurance, which they did by: (i) establishing and maintaining multiple pipelines that funneled Insureds to their respective locations; and then (ii) entering into agreements with no-fault providers pursuant to which the Clinics provided access to their pools of Insureds in exchange for financial remuneration.

52.     In general, the Clinics, or their representatives, were paid a sum of money by Grody and the John Doe Defendants. Though the payments were typically disguised as "rent," they were, in reality, kickbacks for referrals, and the relationships between the Lloyd Entity Defendants and the Clinics were "pay-to-play" arrangements. In connection with these arrangements, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's representatives to one of the unlicensed "social workers" present at the facility for psychological evaluation and testing, regardless of individual symptoms, presentation, or – in most cases – the total absence of any clinically significant psychological symptoms arising from any automobile accident.

53.     The Clinic representatives typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to one of the unlicensed "social workers".

54.     The unlawful kickback and referral arrangements were essential to the success of the fraudulent scheme. The Defendants derived significant financial benefit from the relationships with the Clinics because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other New York automobile insurers.

55.     The Defendants always knew that the kickbacks and referral arrangements were illegal and, therefore took affirmative steps to conceal the existence of the fraudulent referral scheme and the fraudulent billing.

56.     In fact, Grody and the John Doe Defendants created and operated each of the Lloyd Entity Defendants for only short periods of time, and in succession with each other, as well as in succession with other psychology "practices" that they also secretly and unlawfully owned and managed, including the psychology "practices" named in Tenenbaum, Polino, Stallings, Bily-Linder, and Gepp, among others, in an effort to limit the billing for the Fraudulent Services submitted to GEICO by any one entity and to "stay under the radar" of GEICO and other New York automobile insurers.

### 3.     Execution of the Fraudulent Scheme

57.     Once the requisite components were in place, Grody arranged to have the unlicensed "social workers" go to the Clinics to generate the necessary treatment reports for the unlawfully referred Insureds. Grody and the John Doe Defendants then used Lloyd's license number, signature, and the tax identification numbers associated with the respective Lloyd Entity Defendants to fabricate the claim documents necessary to support the fraudulent claim submissions to GEICO and other New York automobile insurers, including assignment of benefits ("AOBs") forms and other medical records.

58.     Then Grody and the John Doe Defendants began transferring the fabricated claim documents, to the various funding sources associated with the scheme.

59.     Upon receipt of the fabricated documents, the funding sources began transferring "advances" against the claims for the Fraudulent Services to the Lloyd Entity Defendants, who

then typically forwarded the funds to either of two shell companies owned by Grody called Oliver

Consulting, LLC and Margot Consulting, LLC (collectively the "Grody Shell Companies").

60.     For instance, to date, GEICO has identified a significant number of checks drawn

on Tristate PC's account and made out to the Grody Shell Companies.

61.     For example:



62.     In addition to sending the fabricated treatment and billing records to the funding

sources, Grody and the John Doe Defendants also forwarded the fabricated documents to New

York collections lawyers (the "Collections Lawyers") with whom they associated who agreed to

purport to represent Lloyd and the Lloyd Entity Defendants. In reality, the Collections Lawyers

did not represent Lloyd or the Lloyd Entity Defendants and, instead, were "retained" by Grody

and the John Doe Defendants.

63.     Upon receipt of the fabricated documents, the Collections Lawyers began sending

the claims submissions to GEICO and other New York automobile insurers seeking payment for

the Fraudulent Services in the names of the Lloyd Entity Defendants using the United States mails.

64.    Once the checks from insurers were received by the Collections Lawyers, the Collections Lawyers forwarded the checks to Grody who then endorsed the checks and deposited the funds into accounts over which Grody had control.

65.    For instance, to date, GEICO has identified a significant number of insurance reimbursement checks made out to SLSP c/o a certain Collections Lawyer associated with the scheme, which ultimately were endorsed and deposited by Grody.

66.    For example:



**B.    The Defendants' Fraudulent Treatment and Billing Protocol**

67.    Every Insured who was seen by the predominantly unlicensed "social workers" on behalf of the Lloyd Entity Defendants was purportedly subjected to both a psychological diagnostic evaluation and a neurobehavioral status exam, as well as to other "psychological services" that were provided pursuant to a predetermined protocol. At the conclusion of each Insured's initial – and oftentimes only – visit with either of the Lloyd Entity Defendants, billing in the amount of either $1,576.14 or $2,490.50 was typically submitted or caused to be submitted by Lloyd, Grody, and the John Doe Defendants through Tristate PC or SLSP, respectively, to GEICO.

1.    **The Fraudulent Psychiatric Diagnostic Evaluation Charges**

68.    Once an Insured was referred to an unlicensed "social worker" pursuant to the payments provided by Grody and the John Doe Defendants, the unlicensed "social worker" purported to conduct a psychiatric diagnostic evaluation of the Insured.

69.    As set forth in Exhibits "1" and "2", Lloyd, Grody, and the John Doe Defendants then billed the psychiatric diagnostic evaluation to GEICO either through: (i) Tristate PC, under CPT code 90801, virtually always resulting in a charge of $194.58; or (ii) SLSP, under CPT code 90791, virtually always resulting in a charge of $305.73.

70.    The charges for the psychiatric diagnostic evaluations identified in Exhibits "1" and "2" were fraudulent in that, as set forth above, the psychiatric diagnostic evaluations were conducted, to the extent conducted at all, pursuant to the improper financial arrangements between the Defendants and the Clinics, and not pursuant to the documented and clinically reasonable needs of the Insureds.

71.    In addition, the charges for the psychiatric diagnostic were fraudulent in that the psychiatric diagnostic evaluations were: (i) medically unnecessary; and (ii) never performed a legitimate manner in the first instance.

a.    **Basic, Legitimate Psychiatric Diagnostic Evaluations**

72.    A psychiatric diagnostic evaluation is an integrated assessment whereby a mental health practitioner elicits patient data and then uses that data to establish a diagnosis and to formulate an individualized treatment plan for that patient.

73.    In a legitimate clinical setting, during a psychiatric diagnostic evaluation, the data necessary to establish a diagnosis and formulate an individualized treatment plan is primarily elicited through a thorough patient interview and mental status examination, and occasionally other

sources, including a review of past medical records and/or reports from family members and significant others.

74.    The patient interview is a face-to-face encounter between the mental health practitioner and patient during which the practitioner observes the patient and elicits information regarding the patient's chief complaint, medical history, psychological history, family history, and social history.

75.    The mental status examination is a structured assessment of the patient's behavioral and cognitive functioning. It includes descriptions of the patient's appearance and general behavior, level of consciousness and attentiveness, thought processes, mood and affect, thought and perception, insight and judgment, and higher cognitive function, including memory, intellect, attention, and concentration. Typically, some components of the mental status examination are obtained through observation and other components are obtained through questioning of the patient.

76.    In non-complex cases, a psychiatric diagnostic evaluation consisting of a patient interview and a mental status examination will typically elicit patient data sufficient to establish a diagnosis and formulate an individualized treatment plan for that patient. In an atypical or complex case, where a patient interview and mental status examination results in a differential diagnosis rather than an established diagnosis, a mental health practitioner may choose to incorporate simple self-administered or self-scored inventories, screening tests, or other similar tests to establish a diagnosis. The use of these simple types of inventories/tests are considered part of the evaluation service and are not separately payable as psychological testing.

### b.    The Medically Unnecessary Psychiatric Diagnostic Evaluations

77.    In the claims identified in Exhibits "1" and "2", the vast majority of the Insureds did not suffer clinically significant psychological symptoms as a result of their underlying automobile accidents such that a psychiatric diagnostic evaluation was medically necessary.

78.    In a legitimate clinical setting, a psychiatric diagnostic evaluation is medically necessary when a patient has a psychological illness and/or is demonstrating emotional or behavioral symptoms which manifest in inappropriate behavior patterns or maladaptive functioning in personal or social settings, when a patient's baseline functioning is altered by suspected illness or symptoms, or when a patient exhibits a sudden and rapid change in behavior.

79.    In keeping with the fact that in the claims identified in Exhibits "1" and "2", the vast majority of the Insureds did not suffer clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, the vast majority of the Insureds whom the Defendants purported to treat were involved in very minor, "fender–bender" accidents.

80.    For example, in many of the claims identified in Exhibits "1" and "2", contemporaneous police reports indicated that the Insureds' accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured, or injured at all, in the underlying accidents.

81.    In addition, in many of the claims identified in Exhibits "1" and "2", the Insureds did not seek treatment at any hospital as the result of their accidents, and virtually all of the Insureds who did go to the hospital were briefly observed in the emergency room and then released after a few hours, typically with nothing more serious than a soft tissue injury diagnosis, and no documented psychological symptoms.

82.    It is highly improbable that these trivial "fender-benders" – which practically never resulted in serious physical injury – would have caused clinically significant psychological symptoms such that a psychiatric diagnostic evaluation was medically necessary in any of the Insureds who purportedly experienced them, much less in multiple Insureds involved in the same relatively minor accidents identified in Exhibits "1" and "2".

83.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, oftentimes with two or more Insureds involved in the same relatively minor accident presenting for psychiatric diagnostic evaluations at one of the Lloyd Entity Defendants on or about the exact same dates several weeks or even months after their accidents.

84.    Even so, in keeping with the fact that the psychiatric diagnostic examinations purportedly conducted by the unlicensed "social workers" and the Defendants were medically unnecessary, the unlicensed "social workers" and the Defendants frequently purported to conduct psychiatric diagnostic evaluations on two or more Insureds involved in the same minor accident, on or about the same day, often many weeks and even months after the underlying accident, and at the conclusion of the psychiatric diagnostic evaluations, issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to the Insureds.

85.    For example:

(i)    On July 20, 2019, <u>four</u> Insureds – VB, NB, OS, and SU – were involved in a relatively minor automobile accident. Thereafter, VB, NB, OS, and SU presented on July 23, 2019 to Tristate PC for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to VB, NB, OS, and SU.

(ii)     On January 16, 2020, two Insureds – MR and JW – were involved in a relatively minor automobile accident. Thereafter, <u>six months later</u>, MR and JW presented on July 28, 2020 to Tristate PC for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to MR and JW.

(iii)    On February 14, 2020, two Insureds – DS and TS – were involved in a relatively minor automobile accident. Thereafter, <u>five months later</u>, DS and TS presented on July 2, 2020 to Tristate PC for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to DS and TS.

(iv)     On May 25, 2020, two Insureds – BC and LR – were involved in a relatively minor automobile accident. Thereafter, <u>one month later</u>, BC and LR presented on June 24, 2020 to Tristate PC for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to BC and LR.

(v)      On July 1, 2020, two Insureds – CC and MF – were involved in a relatively minor automobile accident. Thereafter, <u>more than a month later</u>, CC and MF presented on August 11, 2020 to Tristate PC for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to CC and MF.

(vi)     On October 13, 2020, two Insureds – DV and MV – were involved in a relatively minor automobile accident. Thereafter, <u>more than five months later</u>, DV and MV presented on March 25, 2021 to Tristate PC for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to DV and MV.

(vii)    On January 28, 2021, two Insureds – SS and SY – were involved in a relatively minor automobile accident. Thereafter, <u>more than four months later</u>, SS and SY presented on June 1, 2021 to Tristate PC for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to SS and SY.

(viii)    On March 16, 2021, two Insureds – HI and LI – were involved in a relatively minor automobile accident. Thereafter, <u>more than a month later</u>, HI and LI presented on April 20, 2021 to Tristate PC for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to HI and LI.

(ix)    On March 16, 2021, two Insureds – AF and MG – were involved in a relatively minor automobile accident. Thereafter, <u>more than two months later</u>, AF and MG presented on May 18, 2021 to Tristate PC for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to AF and MG.

(x)    On May 18, 2021, three Insureds – MC, MJ, and LJ – were involved in a relatively minor automobile accident. Thereafter, <u>more than a month later</u>, MC, MJ, and LJ presented on June 29, 2021 to Tristate PC for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to MC, MJ, and LJ.

86.    These are only representative examples. In the claims for psychiatric diagnostic evaluations that are identified in Exhibits "1" and "2", the unlicensed "social workers" and the Defendants often purported to conduct psychiatric diagnostic evaluations of two or more Insureds involved in the same minor accident, on or about the same day, often many weeks and even months after the underlying accident, and at the conclusion of the psychiatric diagnostic evaluations, issue

substantially identical "diagnoses" and recommend substantially similar courses of medically unnecessary "treatment" to the Insureds.

### c.     The Psychiatric Diagnostic Evaluations That Were Never Conducted in a Legitimate Manner in the First Instance

87.     In addition to being medically unnecessary, the charges that the Defendants submitted or caused to be submitted to GEICO for the purported psychiatric diagnostic evaluations, as identified in Exhibits "1" and "2", falsely represented that the evaluations were performed in a legitimate manner in the first instance.

88.     As set forth above, in a legitimate clinical setting, a psychiatric diagnostic evaluation generally entails gathering history, reviewing records, and carrying out a clinical interview and mental status examination, and then using that data to formulate a diagnosis and treatment plan.

89.     In keeping with the fact that the psychiatric diagnostic evaluations were never legitimately performed in the first instance, the unlicensed "social workers" and the Defendants did not conduct a legitimate clinical interview of any Insured during the purported psychiatric diagnostic evaluations.

90.     For example, to the extent the unlicensed "social workers" and the Defendants performed a clinical interview of any Insured at all, the unlicensed "social workers" and the Defendants used template forms with limited parameters in conducting the "interviews".

91.     In fact, the clinical interview portions of the psychiatric diagnostic evaluations, to the extent performed at all, were not meant to have any legitimate benefit for the Insureds that treated with the Lloyd Entity Defendants, but rather were only conducted in order to establish a basis for the charges submitted under CPT codes 90719 and 90801, as well as for the additional

Fraudulent Services to which the unlicensed "social workers" and the Defendants purported to subject the Insureds, including psychological and/or neuropsychological "testing".

92.    For example, irrespective of any data elicited through the putative clinical interviews, the psychological evaluation reports submitted through the Lloyd Entity Defendants all contained boilerplate language and findings. Only the Insureds' respective background information was unique to any particular patient.

93.    For instance, virtually every report submitted through Tristate PC to GEICO contained the following boilerplate language:

> "Initial Treatment Process Note"
>
> At the time of evaluation, the above named patient reported a number of symptoms that had developed or worsened since the motor vehicle accident. Several of these symptoms present at clinically significant levels and are currently impairing the patient's adaptive functioning. It has been recommended for the patient to minimize the trauma, develop coping skills and address anxiety. A major aim of the session was to develop a therapeutic alliance between patient and therapist. During the initial evaluation patient was provided with psychoeducation and brief supportive therapy.

94.    In addition, virtually every psychiatric diagnostic evaluation report submitted through Tristate PC to GEICO checked off the exact same "Target Symptoms", "Functional/Behavioral Challenges", "Therapeutic Goals", "Specific Clinical Interventions", and "Suggested Behavioral Approached".

95.    For example:



96.    What is more, virtually every psychiatric diagnostic evaluation report submitted

through SLSP to GEICO, contained the following boilerplate statement:

> Given [name of Insured] above noted current psychological complaints in relation
> to [his/her] accident, the following battery of tests were administered to provide
> validation of diagnoses, provide baseline measures for [his/her] functioning, and
> determine prognosis. Further the results will be used to aid clinical decision-making
> during treatment. As there are no assessment instruments specifically designed and
> validated for the personal injury evaluations, the tests in this battery are chosen with
> consideration of the unique symptoms and psychopathology found in personal

injury claimants. All relevant tests used are shown to have good reliability and validity.

97.     In addition, and also in keeping with the fact that the charges that the Defendants submitted for the purported psychiatric diagnostic evaluations falsely represented that the evaluations were performed in a legitimate manner, at the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social workers" and the Defendants assigned the vast majority of Insureds a phony "diagnosis" of either an adjustment disorder or a pain disorder with related psychological factors, purportedly as a result of trauma incurred during a minor automobile accident. The Insureds received these phony "diagnoses" regardless of their individual circumstances or unique presentation. In actuality, the vast majority of Insureds did not suffer from any clinically significant psychological symptoms as a result of the minor automobile accidents they supposedly experienced.

98.     What is more, boilerplate treatment plans given to all patients at the conclusion of psychiatric diagnostic evaluations are not valid treatment plans. Even so, and in keeping with the fact that the psychiatric diagnostic evaluations were not legitimately performed, after assigning phony "diagnoses" to the Insureds, rather than providing each Insured with an individualized treatment plan based on the Insured's individual circumstances, symptomology, and presentation, the unlicensed "social workers" and the Defendants provided virtually every Insured with the exact same boilerplate treatment plan, differing only based upon whether the Insured treated with Tristate PC or SLSP.

99.     For instance, at the conclusion of their purported psychiatric diagnostic evaluations, virtually every Insured who treated with Tristate PC was issued a treatment plan that consisted of supportive psychotherapy and relaxation therapy once per week.

100.    In addition, at the conclusion of their purported psychiatric diagnostic evaluations, virtually every Insured who treated with SLSP was issued the following boilerplate treatment plan:

> [Name of Insured] should receive Supportive Psychotherapy through Cognitive-Behavioral Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with disability and regulate pain levels.

### 2.    The Fraudulent Neurobehavioral Status Exam Charges

101.    On the same dates of service that Insureds in the claims identified in Exhibits "1" and "2" were purportedly subjected to "psychiatric diagnostic evaluations," the unlicensed "social workers" and the Defendants purported to provide those same Insureds with "neurobehavioral status exams."

102.    The purported neurobehavioral status exams were then billed to GEICO in the following manner:

> (i)    in the claims identified in Exhibit "1", Lloyd, Grody, the John Doe Defendants, and Tristate PC routinely submitted or caused to be submitted to GEICO billing for a six (6) hour neurobehavioral status exam under CPT 96116, virtually always resulting in a charge of $1,237.44; and

> (ii)    in the claims identified in Exhibit "2", Lloyd, Grody, and the John Doe Defendants routinely submitted or caused to be submitted to GEICO billing for a one (1) hour neurobehavioral status exam under CPT 96116, virtually always resulting in a charge of $324.07.

103.    A "neurobehavioral status exam" is a neuropsychological assessment that provides information about diagnosis, prognosis, and treatment of disorders that are known to impact the central nervous system functioning, and predict functional abilities across a variety of disorders.

104.    The use of CPT code 96116 represents that a physician or other licensed healthcare professional conducted a neurobehavioral assessment consisting of: (i) a face-to-face assessment of a patient's thinking, reasoning, and judgment; (ii) administration, grading, and interpretation of individualized neuropsychological testing; and (iii) preparation of a written report.

105.    The charges for the neurobehavioral status exams identified in Exhibits "1" and "2" were fraudulent in that, as set forth above, the neurobehavioral status exams were conducted, to the extent conducted at all, pursuant to the improper financial arrangements between the Defendants and the Clinics, and not pursuant to the documented and clinically reasonable needs of the Insureds.

106.    In addition, the charges for the neurobehavioral status exams identified in Exhibits "1" and "2" were fraudulent in that the neurobehavioral status exams were: (i) medically unnecessary; and (ii) never legitimately performed in the first instance.

### a.    The Medically Unnecessary Neurobehavioral Status Exams

107.    In a legitimate clinical setting, a neurobehavioral status exam is medically necessary when, among other things: (a) trauma-based cognitive impairment is suspected; (b) the questions to be addressed though the neurobehavioral status exam cannot be answered through means of a conventional psychiatric diagnostic evaluation; and (c) the results of the testing are likely to have a direct and significant impact on the clinical management of the patient.

108.    In keeping with the fact that the neurobehavioral status exams purportedly performed by the unlicensed "social workers" for which billing was then submitted through the Lloyd Entity Defendants to GEICO were not medically necessary, the unlicensed "social workers" and the Defendants purported to conduct neurobehavioral status exams on virtually every Insured, as a matter of course, even in the absence of cognitive impairment symptoms.

109.    For example:

(i)    On or about January 29, 2020, an Insured named IG was involved in an automobile collision. Thereafter, on June 25, 2020, IG presented at Tristate PC for a psychiatric diagnostic evaluation. Though at the time of the evaluation, IG reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on IG.

Billing was then submitted through Tristate PC to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(ii)     On or about February 12, 2020, an Insured named NS was involved in an automobile collision. Thereafter, on July 2, 2020, NS presented at Tristate PC for a psychiatric diagnostic evaluation. Though at the time of the evaluation, NS reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on NS. Billing was then submitted through Tristate PC to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(iii)    On or about February 20, 2020, an Insured named TN was involved in an automobile collision. Thereafter, on July 16, 2020, TN presented at Tristate PC for a psychiatric diagnostic evaluation. Though at the time of the evaluation, TN reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on TN. Billing was then submitted through Tristate PC to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(iv)     On or about February 21, 2020, an Insured named LD was involved in an automobile collision. Thereafter, on June 8, 2020, LD presented at Tristate PC for a psychiatric diagnostic evaluation. Though at the time of the evaluation, LD reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on LD. Billing was then submitted through Tristate PC to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(v)      On or about March 28, 2020, an Insured named JP was involved in an automobile collision. Thereafter, on May 29, 2020, JP presented at Tristate PC for a psychiatric diagnostic evaluation. Though at the time of the evaluation, JP reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on JP. Billing was then submitted through Tristate PC to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(vi)     On or about April 12, 2020, an Insured named YJ was involved in an automobile collision. Thereafter, on May 22, 2020, YJ presented at Tristate PC for a psychiatric diagnostic evaluation. Though at the time of the evaluation, YJ reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on YJ.

Billing was then submitted through Tristate PC to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(vii)    On or about May 6, 2020, an Insured named AW was involved in an automobile collision. Thereafter, on June 24, 2020, AW presented at Tristate PC for a psychiatric diagnostic evaluation. Though at the time of the evaluation, AW reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on AW. Billing was then submitted through Tristate PC to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(viii)   On or about May 30, 2020, an Insured named MM was involved in an automobile collision. Thereafter, on June 30, 2020, MM presented at Tristate PC for a psychiatric diagnostic evaluation. Though at the time of the evaluation, MM reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on MM. Billing was then submitted through Tristate PC to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(ix)     On or about July 20, 2020, an Insured named TE was involved in an automobile collision. Thereafter, on August 3, 2020, TE presented at Tristate PC for a psychiatric diagnostic evaluation. Though at the time of the evaluation, TE reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on TE. Billing was then submitted through Tristate PC to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(x)      On or about August 3, 2020, an Insured named CB was involved in an automobile collision. Thereafter, on September 15, 2020, CB presented at Tristate PC for a psychiatric diagnostic evaluation. Though at the time of the evaluation, CB reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on CB. Billing was then submitted through Tristate PC to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xi)     On or about December 2, 2020, an Insured named JP was involved in an automobile collision. Thereafter, on January 25, 2021, JP presented at SLSP for a psychiatric diagnostic evaluation. Though JP reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social

worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on JP. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xii)    On or about December 24, 2020, an Insured named AR was involved in an automobile collision. Thereafter, on January 26, 2021, AR presented at SLSP for a psychiatric diagnostic evaluation. Though AR reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on AR. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xiii)   On or about December 24, 2020, an Insured named LB was involved in an automobile collision. Thereafter, on January 27, 2021, LB presented at SLSP for a psychiatric diagnostic evaluation. Though LB reported no cognitive symptoms at the time of the evaluation, and though her speech was "clear", her motor activity was "normal", she was "oriented x4", her thought process was "logical", she was "alert" and "attentive", and she displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on LB. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xiv)    On or about January 18, 2021, an Insured named AG was involved in an automobile collision. Thereafter, on January 25, 2021, AG presented at SLSP for a psychiatric diagnostic evaluation. Though AG reported no cognitive symptoms at the time of the evaluation, and though her speech was "clear", her motor activity was "normal", she was "oriented x4", her thought process was "logical", she was "alert" and "attentive", and she displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on AG. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xv)     On or about February 23, 2021, an Insured named KW was involved in an automobile collision. Thereafter, on March 17, 2021, KW presented at SLSP for a psychiatric diagnostic evaluation. Though KW reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his

thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on KW. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xvi)    On or about March 3, 2021, an Insured named MS was involved in an automobile collision. Thereafter, on March 17, 2021, MS presented at SLSP for a psychiatric diagnostic evaluation. Though MS reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on MS. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xvii)    On or about April 1, 2021, an Insured named EE was involved in an automobile collision. Thereafter, on July 1, 2021, EE presented at SLSP for a psychiatric diagnostic evaluation. Though EE reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on EE. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xviii)    On or about April 24, 2021, an Insured named CS was involved in an automobile collision. Thereafter, on May 4, 2021, CS presented at SLSP for a psychiatric diagnostic evaluation. Though CS reported no cognitive symptoms at the time of the evaluation, and though her speech was "clear", her motor activity was "normal", she was "oriented x4", her thought process was "logical", she was "alert" and "attentive", and she displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on CS. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xix)    On or about May 6, 2021, an Insured named JL was involved in an automobile collision. Thereafter, on June 2, 2021, JL presented at SLSP for a psychiatric diagnostic evaluation. Though JL reported no cognitive

symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on JL. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xx)    On or about June 20, 2021, an Insured named GJ was involved in an automobile collision. Thereafter, on June 21, 2021, GJ presented at SLSP for a psychiatric diagnostic evaluation. Though GJ reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", Lloyd, Grody, and the John Doe Defendants purported to conduct a neurobehavioral status exam on GJ. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

110.    These are only representative samples.

111.    In the claims neurobehavioral status exams that are identified in Exhibits "1" and "2", an unlicensed "social worker" and the Defendants routinely purported to contemporaneously conduct neurobehavioral status exams and psychiatric diagnostic evaluations on Insureds, often in the complete absence of clinically significant psychiatric symptoms or cognitive impairment resulting from the Insureds' underlying automobile collisions.

112.    What is more, and in keeping with the fact that the neurobehavioral status exams were medically unnecessary, the unlicensed "social workers" and the Defendants purported to provide both a psychiatric diagnostic evaluation and a neurobehavioral status exam to virtually every Insured on the same dates of service, as a matter of course, and without any individualized determination that the psychiatric diagnostic evaluations failed to address any question or questions central to the Insureds' diagnosis and treatment.

113.    In further keeping with the fact that the neurobehavioral status exams were not medically necessary, not only did the results of the testing not have a "direct and significant impact" on the clinical management of any Insured, they had no impact whatsoever.

114.    For instance, as set forth above, regardless of the "results" of the purported neurobehavioral status exams, at the conclusion of the exams, the unlicensed "social workers" and the Defendants assigned the Insureds bogus diagnoses and provided boilerplate treatment plans, as a matter of course.

**b.    The Neurobehavioral Status Exams That Were Never Conducted in a Legitimate Manner in the First Instance**

115.    In addition to the neurobehavioral status exams being medically unnecessary, the charges that the Defendants submitted or caused to be submitted to GEICO for the purported neurobehavioral status exams, as identified in Exhibits "1" and "2", falsely represented that the exams were conducted in a legitimate manner in the first instance.

116.    As set forth above, in a legitimate clinical setting, a neurobehavioral status exam generally entails: (i) a face-to-face assessment of a patient's thinking, reasoning, and judgment; (ii) administration, grading, and interpretation of individualized neuropsychological testing; and (iii) preparation of a written report.

117.    In keeping with the fact that the neurobehavioral status exams for which charges were submitted through the Lloyd Entity Defendants to GEICO were not performed in a legitimate manner in the first instance, the unlicensed "social workers" and the Defendants never performed a face-to-face assessment of any Insured for the purposes of assessing the Insured's thinking, reasoning, and judgement. In fact, the only face-to-face interaction that the unlicensed "social workers" had with any Insured was during the patient interviews purportedly conducted as part of the psychiatric diagnostic evaluations. As set forth above, the face-to-face interviews performed

during the psychiatric diagnostic evaluations were perfunctory, conducted according to templates and checklists consisting of limited parameters, and not intended to elicit any information that would significantly affect the diagnosis or treatment of any Insured, including information regarding the Insured's thinking, reasoning, and judgment.

118.    What is more, and in further keeping with the fact that the neurobehavioral status exams were not performed in a legitimate manner the first instance, the unlicensed "social workers" and the Defendants never administered, graded, and interpreted individualized neuropsychological testing as part of the neurobehavioral status exams. Instead, the unlicensed "social workers" and the Defendants purported to provide an identical battery of "neuropsychological testing" to virtually every Insured who treated with either Tristate PC or SLSP, without regard to any Insured's individual circumstances or presentment.

119.    In particular, the unlicensed "social workers" and the Defendants purported to perform the following "neuropsychological testing" on virtually every Insured who treated with Tristate PC:

> (i)    Beck Anxiety Inventory ("BAI") – a twenty-one question self-report used to evaluate the symptoms of anxiety. A BAI typically takes ten to fifteen (10-15) minutes to administer;
>
> (ii)   Beck Depression Inventory – II ("BDI") – a twenty-one question self-report used to evaluate the symptoms of depression. A BDI typically takes ten to fifteen (10-15) minutes to administer;
>
> (iii)  PCL-C ("PTSD Checklist") – a 17-item self-reporting rating scale used to evaluate symptoms of PTSD. A PTSD Checklist typically takes five to ten (5-10) minutes to administer; and
>
> (iv)   Montreal Cognitive Assessment ("MoCA") – a rapid screening instrument that assesses mild cognitive dysfunction. A MoCA typically takes ten (10) minutes to administer.

120. In addition, the unlicensed "social workers" and the Defendants purported to perform the following "neuropsychological testing" on virtually every Insured who treated with SLSP:

    (i)    Short Blessed Test ("SBT") – a simple 6-question screening tool that assesses cognitive changes associated with dementia. An SBT typically takes five to ten (5-10) minutes to administer;

    (ii)    BAI – see ¶ 119(i) above;

    (iii)    BDI – see ¶ 119(ii) above;

    (iv)    Beck Hopelessness Scale ("BHS") – a set of 10-20 true/false questions used to assess a patient's mental state with regards to the future, motivation, and expectations. A BHS typically takes ten to fifteen (10-15) minutes to administer;

    (v)    Pain Disability Index ("PDI") – a 7-item self-report instrument that helps measure the impact chronic pain has on a person's life activities. A PDI typically takes approximately five (5) minutes to administer;

    (vi)    Posttraumatic Stress Disorder Checklist for DSMI-5 ("PCL-5") – a 20-item self-report measure that assesses the 20 DSM-5 symptoms of PTSD. A PCL-5 typically takes five to ten (5-10) minutes to administer;

    (vii)    Health Status Questionnaire 1.0 ("HSQ") – a 39-item multiple choice test used to assess health attributes, health status change, and risk of depression. An HSQ typically takes five to ten (5-10) minutes to administer; and

    (viii)    Psychological Inflexibility in Pain Scale (PIPS) – a 16-item scale used to assess psychological inflexibility in people with chronic pain. A PIPS typically takes approximately five to ten (5-10) minutes to administer.

121. Finally, and in further keeping with the fact that the unlicensed "social workers" and the Defendants never conducted a neurobehavioral status exam in a legitimate manner in the first instance, the unlicensed "social workers" and the Defendants never drafted a legitimate written, interpretive report reflecting the purported neurobehavioral status exams.

122. In fact, the only written "reports" submitted through the Lloyd Entity Defendants to GEICO were the purported psychiatric diagnostic evaluation reports discussed above.

123. To the extent that the psychiatric diagnostic evaluation reports submitted through the Lloyd Entity Defendants to GEICO at all addressed the purported neurobehavioral status exams, the reports merely included the Insureds' putative test "scores" with no legitimate substantive analysis.

124. For example, though virtually all of the written reports submitted through SLSP contained a section labelled "Impressions", the section merely consisted of the following boilerplate language that was copied from one Insured's report to the next and which does not in any way reference cognitive impairment:

> Impressions: According to the preliminary results, [name of Insured] is suffering from emotional and behavioral problems in addition to physical outcomes of the accident. These symptoms are consequently and casually related to the accident on [date of underlying accident].

125. What is more, as set forth above, the written reports submitted through Tristate PC to GEICO were comprised of nothing more than some identifying information about the respective Insureds and their accidents, a boilerplate "Initial Treatment Progress Note", virtually the same exact checked off "Target Symptoms", "Functional/Behavioral Challenges", "Therapeutic Goals", "Specific Clinical Interventions", and "Suggested Behavioral Approached", and a boilerplate "treatment plan." Not included in the reports was any analysis of any Insured's neurobehavioral status or cognitive impairment.

c.    **Tristate PC's Misrepresentations Regarding the Amount of Time Spent on Neurobehavioral Status Exams**

126. Furthermore, charges for the neurobehavioral status exams that were submitted by Lloyd, Grody, and the John Doe Defendants through Tristate PC to GEICO, as identified in Exhibit "1", were also fraudulent because – notwithstanding the Defendants' misrepresentations that the

exams virtually always took six (6) hours to perform – the exams never took more than one (1) hour to conduct, to the extent conducted at all.

127.    In particular, virtually every bill for a six (6) hour neurobehavioral status exam submitted through Tristate PC to GEICO included a "superbill" that allocated the billed time in the following manner: (i) "Face to Face Administration" – one (1) hour; (ii) "Scoring" – one (1) hour and thirty (30) minutes; (iii) "Interpretation" – three (3) hours; and (iv) "Report Prep" – one (1) hour.

128.    For example:



129.    In fact, the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and Tristate PC did not spend (i) one (1) hour conducting "face to face administration" of neuropsychological testing. Rather, in virtually every case, at most, the unlicensed "social workers" personally administered the 1-page MoCA to the Insured, a process that typically takes ten (10) minutes to complete. The three (3) remaining tests (BAI, BDI-2, and PTSD Checklist)

were not administered face-to-face by the unlicensed "social workers", but rather were automatically distributed to the Insureds by the front desk receptionists at the Clinics, and the Insureds typically filled them out before even meeting any of the unlicensed "social workers".

130.    Nor did the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and Tristate PC spend one (1) hour and thirty (30) minutes "scoring" the four (4) tests, but rather just minutes.

131.    In keeping with the fact that the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and Tristate PC only spent, at most, minutes "scoring" an Insured's tests, scoring of the: (i) BAI involves nothing more than tabulating the overall score where the patient assigned a value between zero (0) and three (3) to twenty-one (21) symptoms; (ii) BDI-2 involves nothing more than tabulating the overall score where the patient assigned a value between zero (0) and three (3) to twenty-one (21) feelings; (iii) PCL-C involves nothing more than tabulating the overall score where the patient assigned a value between one (1) and five (5) to seventeen (17) stressful life experience; and (iv) MoCA scoring is performed contemporaneously with the administration of the test, which typically takes ten (10) minutes to complete.

132.    What is more, though Tristate PC's billing represents that the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and Tristate PC spent three (3) "interpreting" each Insured's test results, in fact, the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and Tristate PC performed no interpretation of test results.

133.    In keeping with the fact that the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and Tristate PC performed no interpretation of test results, as set forth above, the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and Tristate PC

assigned each Insured a bogus diagnosis and boilerplate treatment plan, irrespective of any Insured's test results.

134.    Finally, the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and Tristate PC spent, at most, a few minutes preparing a written report reflecting each Insured's purported neurobehavioral status exam – not one (1) hour per report. In fact, the written neurobehavioral status exam reports submitted through Tristate PC to GEICO consisted of nothing more than one (1) page containing information cut and pasted from the Insured's psychiatric diagnostic evaluation report and the Insured's completed test papers.

### 3.    SLSP's Fraudulent Charges for Psychological Testing and Neuropsychological Testing

135.    Not only did Lloyd, Grody, and the John Doe Defendants submit or cause to be submitted improper billing for psychiatric diagnostic evaluations and neurobehavioral status exams through SLSP, the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and SLSP also purported to provide those same Insureds with a battery of needless psychological tests and neuropsychological tests (collectively the "Psych Testing").

136.    Lloyd, Grody, the John Doe Defendants, and SLSP then billed or caused to be billed to GEICO: (i) the psychological testing under CPT code 96101, virtually always for four (4) hours of testing, at a rate of $290.12 per hour; and (ii) the neuropsychological testing under CPT code 96118, virtually always for two (2) hours of testing, at a rate of $350.11 per hour. In total, this resulted in routine charges of $1,860.70.22 per round of Psych Testing, separate and apart from the charges for psychiatric diagnostic evaluations and neurobehavioral status exams, per Insured who treated with SLSP.

###### a.    SLSP's Medically Unnecessary Psych Testing

137.    Similar to the charges for the psychiatric diagnostic evaluations and neuropsychological status exams, the charges for the Psych Testing were fraudulent inasmuch as the Psych Testing was medically unnecessary, and was conducted, to the extent conducted at all, pursuant to a pre-determined fraudulent treatment protocol and kickback arrangements between the Defendants and the owners/managers of the Clinics, not pursuant to the documented and clinically-reasonable needs of the Insureds, or to benefit the Insureds who supposedly were subjected to it.

138.    In keeping with the fact that the Psych Testing was medically unnecessary, as set forth above, the vast majority of Insureds did not suffer from any clinically significant psychological symptoms nor any cognitive impairment as a result of their relatively minor accidents.

139.    Even if any of the Insureds did suffer clinically significant symptoms or impairment as a result of their putative accidents – which they did not – in a legitimate clinical setting, the psychiatric diagnostic evaluation is typically the only service necessary to formulate a diagnosis and treatment plan for individual Insureds with non-complex psychological cases. Conversely, as with the neurobehavioral status exams, Psych Testing is only indicated where a diagnosis and treatment plan is not capable of being developed at the conclusion of a psychiatric diagnostic evaluation, typically in complex psychological cases.

140.    In the claims for Psych Testing that are identified in Exhibit "2", few, if any, of the Insureds who purportedly were subjected to Psych Testing by the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and SLSP presented with complex psychological symptoms. Rather, each Insured – to the extent that they suffered any clinically significant

symptoms or impairment at all as a result of their putative automobile accidents – experienced an obvious precipitant (i.e., the underlying automobile accident) and developed the supposed symptoms or impairments in response to the accident. In straightforward, non-complex cases such as these, the clinical interview and mental status examination portions of the psychiatric diagnostic evaluation are generally sufficient mechanisms for gathering the patient data necessary to formulate an individualized diagnosis and treatment plan.

141.    In further keeping with the fact that the purported Psych Testing was medically unnecessary, the Psych Testing was performed, to the extent performed at all, pursuant to the Defendants' fraudulent treatment protocol and unlawful kickbacks and was not intended to elicit any information that would significantly affect the diagnosis or treatment of any Insured.

142.    For instance, the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and SLSP purported to provide an identical battery of Psych Testing to virtually every Insured who treated with SLSP, without regard to any Insureds' individual circumstances or presentment.

143.    Specifically, as set forth above, for those Insureds who treated with SLSP, the unlicensed "social workers" purported to perform an SBI, BAI, BDI-2, BHS, PDI, PCL-5, HSQ, and PIPS, regardless of any Insured's individual symptoms and presentment.

144.    What is more, regardless of any Insured's test scores, SLSP provided each Insured with bogus diagnoses and the same boilerplate treatment plan.

145.    Finally, a "confounding variable" is an unmeasured third variable that influences, or confounds, the relationship between an independent and a dependent variable by suggesting the presence of a spurious correlation. For the results of psychological testing to be valid, all confounding variables must be accounted for and/or removed before the testing is conducted.

146.    Drug use and alcohol use are two examples of confounding variables. This is because drugs and alcohol are mind altering substances capable of suggesting the presence of psychological symptoms resulting from a traumatic event when in fact the psychological symptoms are simply a temporary byproduct of the substance use.

147.    In further keeping with the fact that the purported Psych Testing was medically unnecessary and not intended to elicit any information that would significantly affect the diagnosis or treatment of any Insured, in many cases in the claims identified in Exhibits "1" and "2", though the Insured purported to disclose recent drug and/or alcohol use during the psychiatric diagnostic evaluation, the unlicensed "social worker" purported to conduct the Psych Testing without, at minimum, accounting for the drug and/or alcohol use in the final analysis of the testing results, or, if necessary, requiring the Insured to return for testing after sufficiently detoxing.

**b.    SLSP's misrepresentations Regarding the Amount of Time Spent on Psych Testing**

148.    Furthermore, charges for the Psych Testing that were submitted by Lloyd, Grody, and the John Doe Defendants through SLSP to GEICO, as identified in Exhibit "2", were also fraudulent because, notwithstanding Lloyd, Grody, the John Doe Defendants, and SLSP's misrepresentations that the Psych Testing virtually always took a total of six (6) hours to perform – the tests never took more than, at most, between (1) and two (2) hours to administer, score, and interpret, to the extent they were administered, scored, and interpreted in the first instance.

149.    For example, the Psych Testing virtually always consisted of nothing more than a packet of eight (8) pre-printed checklists, inventories, and/or scales that were automatically distributed to the Insureds by the front desk receptionists at the Clinics, and which the Insureds typically filled out before even meeting any of the unlicensed "social workers".

150.    Even if the Psych Testing was administered face-to-face by the unlicensed "social workers" – which it was not – the maximum amount of time typically needed to administer all eight (8) Psych Tests is just ninety (90) minutes.

151.    What is more, to the extent the billing for Psych Testing submitted through SLSP to GEICO purports to include time for "interpretation" and "report prep", virtually none of the reports submitted by the Defendants through SLSP contained any legitimate written interpretation or analysis of the Psych Testing results.

152.    For instance, as set forth above, though virtually all of the reports submitted through SLSP contained a section labelled "Impressions", the language in each "Impressions" section reflected no legitimate analysis of Psych Testing Results, but rather was merely the following boilerplate language:

> Impressions: According to the preliminary results, [name of Insured] is suffering from emotional and behavioral problems in addition to physical outcomes of the accident. These symptoms are consequently and casually related to the accident on [date of underlying accident].

### c.    The Fraudulent Misrepresentations Regarding the Existence of Written, Interpretive Reports for the Psychological Testing

153.    Finally, the Defendants' charges for the Psychological Testing also are fraudulent in that the use of CPT codes 96116 and 96118 represents that the Defendants have prepared a legitimate written report interpreting the test results. Though the Defendants routinely billed for the Psychological Testing under CPT code codes 96116 and 96118, and though the Defendants submitted what they purport to be interpretive test reports in support of their billing, none of the unlicensed "social workers" or Defendants prepared any valid written reports interpreting the test results.

154.    Rather, virtually every "Psychological Report" submitted or caused to be submitted by the Defendants through the Lloyd Entity Defendants to GEICO in support of the respective Lloyd Entity Defendant's psychological testing charges merely contained the Insureds' putative test "scores" and a summary of answers or actual answers, a one-word interpretation (if any) of the putative test scores (i.e., "normal", "moderate", "mild"), a phony diagnosis purportedly based on the results of the psychological testing, and other boilerplate language.

155.    Then, per his arrangement with Grody and the John Doe Defendants, Lloyd's signature was affixed to the "reports".

### 3.    Tristate PC's "Unbundled" Charges

156.    Not only did Lloyd, Grody, and the John Doe Defendants submit improper billing for psychiatric diagnostic evaluations and neurobehavioral status exams through Tristate PC, they also routinely "unbundled" the charges in order to maximize the billing they could submit, or cause to be submitted, through Tristate PC to GEICO.

157.    In particular, for virtually every Insured that treated with Tristate PC, in addition to submitting charges for a psychiatric diagnostic evaluation, Lloyd, Grody, and the John Doe Defendants, also submitted separate charges through Tristate PC to GEICO for: (i) "psychiatric evaluation of medical records" under CPT code 90885, typically resulting in a separate charge of $67.24; and (ii) 20-30 minutes of individual psychotherapy under CPT code 90804, typically resulting in a separate charge of $76.88.

### a.    Tristate PC's "Unbundled" Record Review Charges

158.    The use of CPT code 90885 represents that a psychologist conducted a "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes." Lloyd, Grody, and the John Doe

Defendants routinely submitted charges through Tristate PC to GEICO under CPT code 90885 falsely representing that a psychiatric evaluation of medical records was performed on the same date of service as the psychiatric diagnostic evaluation, despite the fact that review and evaluation of the Insureds' medical and psychological records was necessary to, and already was reimbursed as an element of, the Insured's purported psychiatric diagnostic evaluation. In other words, Lloyd, Grody, the John Doe Defendants, and Tristate PC cannot conduct and bill for a psychiatric diagnostic evaluation and then bill separately for the contemporaneous review of medical or psychological records.

159.    Furthermore, Lloyd, Grody, the John Doe Defendants, and Tristate PC's charges under CPT code 90885 for record review and evaluation misrepresented the performance of the service because neither Lloyd nor and of the unlicensed "social workers" ever reviewed or evaluated any records to support the charges.

160.    The conclusion that neither Lloyd nor any of the unlicensed "social workers" ever reviewed any records to support the charges billed under CPT code 90885 is confirmed by the fact that the "Review of Medical Records" report accompanying Tristate PC's billing virtually never identified any specific records that were actually reviewed. Rather, without listing any actual records reviewed, the "Review of Medical Records" report simply indicated that, "[t]he review of medical records confirmed that the patient was subjected to a MVA" and then listed the "referring physician's" diagnoses.

### b.    Tristate PC's "Unbundled" Psychotherapy Charges

161.    In addition, on the same date that Insureds in the claims identified in Exhibit "1" were purportedly subjected to a psychiatric diagnostic evaluation and a neurobehavioral status examination, the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and

Tristate PC purported to provide those same Insureds with a 20-30 minute psychotherapy session, for which a charge was then submitted through Tristate PC to GEICO under CPT code 90804, typically resulting in a charge of $76.88 per Insured.

162.    In a legitimate clinical setting, a charge for psychotherapy should only be billed on the same date of service as a charge for a psychiatric diagnostic evaluation if the two services are significant and separately identifiable.

163.    Even so, as a matter of course, Lloyd, Grody, and the John Doe Defendants submitted a charge for a 20-30 minute psychotherapy session purportedly conducted on the same date of service as a psychiatric diagnostic evaluation, for which they also submitted a separate and independent charge, despite the fact that a separate and independent psychotherapy session was never "significant and separately identifiable" from the purported contemporaneously-conducted psychiatric diagnostic evaluation.

164.    In keeping with the fact that a separate and independent psychotherapy session was never "significant and separately identifiable" from the purported contemporaneously-conducted psychiatric diagnostic evaluation, the only "therapy" purportedly provided on the relevant date of service was provided as part of the purported psychiatric diagnostic evaluation.

165.    For instance, the boilerplate "Initial Treatment Process Note" included in every Tristate PC psychiatric diagnostic evaluation report includes the following summary:

> A major aim of the [evaluation] session was to develop a therapeutic alliance between patient and therapist. **During the initial evaluation patient was provided with psychoeducation and supportive therapy**.

(Emphasis added).

### C.   Fraudulent Billing for the "Social Workers" Who Were Neither Licensed, Supervised, nor Employed by the Lloyd Entity Defendants

166.   Defendants' scheme also included the submission of fraudulent claims in the name of the Lloyd Entity Defendants to GEICO seeking payment for services performed by the unlicensed "social workers" who were neither employed by either of the Lloyd Entity Defendants nor supervised by Lloyd or any licensed healthcare professional.

167.   Pursuant to New York Education Law §7605 Sect. 3(13), an individual with a Masters level degree in psychology or its equivalent can practice psychology, including performing psychological testing and counseling, so long as that individual is "working under the supervision of a licensed psychologist."

168.   In addition, under the New York No-Fault Law, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the billing provider itself, or by its employees.

169.   The unlicensed "social workers" were not licensed psychologists, but rather held Masters level degrees in social work (at best). As a result, the No-Fault Law prohibited the Defendants from billing for or recovering No-Fault Benefits from GEICO or other New York automobile insurers for services provided by the unlicensed and unsupervised "social workers."

170.   As set forth above, the unlicensed "social workers" purported to perform nearly all, if not all, of the putative Fraudulent Services on behalf of the Lloyd Entity Defendants. In most cases, the unlicensed "social workers" purported to perform these services at the Clinics, and the services were then billed through one of the Lloyd Entity Defendants to GEICO under New York no-fault insurance policies.

171.    However, the unlicensed "social workers" were not supervised by Lloyd, nor by any other licensed psychologist or licensed healthcare provider, when they purported to perform the putative Fraudulent Services in all of the claims identified in Exhibits "1" and "2".

172.    To the contrary, a licensed psychologist was not even present at any of the Clinics when the unlicensed "social workers" would purport to perform the Fraudulent Services on behalf of the Lloyd Entity Defendants.

173.    Additionally, the unlicensed social workers were never employed by Lloyd or by either of the Lloyd Entity Defendants but all times were directed and controlled by Grody and the John Doe Defendants.

174.    In virtually all of the claims identified in Exhibits "1" and "2", the Lloyd Entity Defendant's billing (i.e. the NF-3 forms) misrepresented that the Fraudulent Services were lawfully performed by Lloyd and that the respective Lloyd Entity Defendant was eligible for no-fault reimbursement, when in fact neither Lloyd Entity Defendant was eligible for PIP reimbursement because the individuals who purportedly performed the Fraudulent Services were the unlicensed, unsupervised "social workers" who were not employed by either Lloyd Entity Defendant, as well as for the additional reasons set forth in this Complaint.

**III.    The Fraudulent Billing Defendants Submitted, or Caused to be Submitted, to GEICO**

175.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted large volumes of NF-3 forms and supporting documentation through the Lloyd Entity Defendant to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

176.    The NF-3 forms, reports, assignment of benefits and other documents submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)    The NF-3 forms, letters, and other supporting documentation by the Defendants through the Lloyd Entity Defendants to GEICO uniformly misrepresented that Lloyd had performed the Fraudulent Services, that his name, license, and the tax identification numbers of the Lloyd Entity Defendants were being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the Grody and the John Doe Defendants unlawfully and secretly controlled, operated, and managed the Lloyd Entity Defendants;

(ii)    The NF-3 forms, letters, and other supporting documentation by the Defendants through the Lloyd Entity Defendants to GEICO uniformly misrepresented that the Defendants were in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were eligible to receive no-fault reimbursement in the first instance, when in fact they were not;

(iii)    The NF-3 forms, letters, and other supporting documentation by the Defendants through the Lloyd Entity Defendants to GEICO uniformly misrepresented that the Fraudulent Services were provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were eligible for no-fault reimbursement in the first instance, when in fact they were not;

(iv)    The NF-3 forms, letters, and other supporting documentation by the Defendants through the Lloyd Entity Defendants to GEICO uniformly concealed that the Fraudulent Services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(v)    The NF-3 forms, letters, and other supporting documentation by the Defendants through the Lloyd Entity Defendants to GEICO uniformly misrepresented that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 despite the fact that the services were provided by unlicensed social workers who were not supervised by Lloyd or any other licensed healthcare practitioner and were not employed by Lloyd or either of the Lloyd Entity Defendants.

IV.    **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

177.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

178.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically made material misrepresentations, concealed their fraud and the underlying scheme, and went to great lengths to accomplish this concealment in the design and implementation of the scheme, the billing submitted to GEICO, and the collection efforts undertaken against GEICO.

179.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Lloyd in the performance of the Fraudulent Services, his lack of control and/or management of the Lloyd Entity Defendants, the fact that the patient referrals were derived through financial payments or other unlawful arrangements between Grody and the John Doe Defendants and the Clinics, as well as the fact that the Fraudulent Services were performed by unlicensed "social workers" that were neither supervised by Lloyd or any other licensed healthcare practitioner and were not employed by Lloyd or either of the Lloyd Entity Defendants.

180.    Additionally, the Defendants entered into complex financial arrangements with one another, as well as with the Clinics and other third parties, that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals and controlled the Lloyd Entity Defendants.

181.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were: (i) medically unnecessary and performed pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were

subjected to the Fraudulent Services; (ii) never performed in the first instance; and (iii) performed by unlicensed social workers that were not supervised by Lloyd or any other licensed healthcare professional and were not employed by either of the Lloyd Entity Defendants.

182.    The collection law firms that associated with the Defendants pursued collection of the charges from GEICO. These law firms routinely filed expensive and time-consuming litigation against GEICO if the charges were not promptly paid in full.

183.    GEICO takes steps to timely respond to all claims and to ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and other fraudulent activity described above, were designed to, and did, cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $163,000.00 based on payments that were made in response to the fraudulent charges.

184.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover, and could not reasonably have discovered, that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Tristate PC and SLSP**
**(Declaratory Relief under 28 U.S.C. §§2201 and 2202)**

185.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

186.    There is an actual case and controversy between GEICO and Tristate PC and SLSP regarding more than $675,000.00 in pending billing submitted through Tristate PC and SLSP.

187.    Tristate PC and SLSP have no right to receive payment for any pending bills submitted to GEICO because the billed for services were submitted through psychology practices not legitimately owned or controlled by licensed psychologists, but which were unlawfully operated, managed, and controlled by Grody and the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

188.    Tristate PC and SLSP have no right to receive payment for any pending bills submitted to GEICO because the billed for services were not medically necessary and were performed – to the extent performed at all – pursuant to improper financial arrangements between Grody and the John Doe Defendants and the Clinics.

189.    Tristate PC and SLSP have no right to receive payment for any pending bills submitted to GEICO because the billed for services were not medically necessary, and were performed – to the extent performed at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

190.    Tristate PC and SLSP have no right to receive payment from GEICO on the unpaid billing because the billing submitted to GEICO for the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

191.    Tristate PC and SLSP have no right to receive payment from GEICO for any pending bills because the psychological services that were billed through Tristate PC and SLSP were provided by unsupervised social workers who were not employed by Lloyd or either of the Lloyd Entity Defendants, in contravention of New York law.

192.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Tristate PC and SLSP have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Grody and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

193.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

194.    Tristate PC is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

195.    Grody and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Tristate PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Tristate PC was not eligible to receive under the New York no-fault insurance law because: (i) the billed for services were submitted through a psychology practice not legitimately owned, operated, or controlled by a licensed psychologist, but which was unlawfully operated, managed, and controlled by the Grody and the John Doe Defendants for the purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Grody and the John Doe Defendants and the Clinics; (iii) the billed for services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather

than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the Fraudulent Services were provided, to the extent provided at all, by unsupervised "social workers" who were not employed by either Lloyd or Tristate PC, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

196.    Tristate PC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Grody and the John Doe Defendants operated Tristate PC, insofar as Tristate PC is not engaged in a legitimate psychology practice, and acts of mail fraud therefore are essential in order for Tristate PC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Grody and the John Doe Defendants continue to attempt to collect on the fraudulent billing submitted through Tristate PC to the present day.

197.    Tristate PC is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Tristate PC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

198.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $128,000.00 pursuant to the fraudulent bills submitted through Tristate PC.

199.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Against Lloyd, Grody, and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

200.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

201.    Tristate PC is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

202.    Lloyd, Grody, and the John Doe Defendants are employed by and/or associated with Tristate PC. Lloyd, Grody, and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Tristate PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Tristate PC was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a psychology practice not legitimately owned, operated, or controlled by a licensed psychologist, but which was unlawfully operated, managed, and controlled by the Grody and the John Doe Defendants for the purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Grody and the John Doe Defendants and the Clinics; (iii) the billed for services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent

treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the Fraudulent Services were provided, to the extent provided at all, by unsupervised "social workers" who were not employed by either Lloyd or Tristate PC, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

203.    Lloyd, Grody, and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

204.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $128,000.00 pursuant to the fraudulent bills submitted by Defendants through Tristate PC.

205.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Tristate PC, Lloyd, Grody, and the John Doe Defendants
### (Common Law Fraud)

206.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

207.    Tristate PC, Lloyd, Grody, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material

facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

208.    The false and fraudulent statements of material fact and acts of fraudulent concealment include the representation that: (i) the billed for services were submitted through a psychology practice that was legitimately owned, operated, or controlled by a licensed psychologist; (ii) the billed for services were provided based upon legitimate decisions by licensed healthcare providers, and not as a result of illegal financial arrangements between the Grody and the John Doe Defendants and the Clinics; (iii) the billed for services were medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the Fraudulent Services were provided in compliance with New York law.

209.    Tristate PC, Lloyd, Grody, and the John Doe Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tristate PC that were not compensable under New York no-fault insurance laws.

210.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $128,000.00 pursuant to the fraudulent bills submitted by the Defendants through Tristate PC.

211.    Tristate PC, Lloyd, Grody, and the John Doe Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

212.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Tristate PC, Lloyd, Grody, and the John Doe Defendants**
**(Unjust Enrichment)**

213.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

214.    As set forth above, Tristate PC, Lloyd, Grody, and the John Doe Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

215.    When GEICO paid the bills and charges submitted by or on behalf of Tristate PC for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Tristate PC, Lloyd, Grody, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

216.    Tristate PC, Lloyd, Grody, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Tristate PC, Lloyd, Grody, and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

217.    Tristate PC, Lloyd, Grody, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

218.    By reason of the above, Tristate PC, Lloyd, Grody, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $128,000.00.

### SIXTH CAUSE OF ACTION
**Against Grody and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

219.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

220.    SLSP is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

221.    Grody and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of SLSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that SLSP was not eligible to receive under the New York no-fault insurance law because: (i) the billed for services were submitted through a psychology practice not legitimately owned, operated, or controlled by a licensed psychologist, but which was unlawfully operated, managed, and controlled by the Grody and the John Doe Defendants for the purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Grody and the John Doe Defendants and the Clinics; (iii) the billed for services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the

Fraudulent Services that purportedly were provided; and (v) the Fraudulent Services were provided, to the extent provided at all, by unsupervised "social workers" who were not employed by either Lloyd or SLSP, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

222.    SLSP's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Grody and the John Doe Defendants operated SLSP, insofar as SLSP is not engaged in a legitimate psychology practice, and acts of mail fraud therefore are essential in order for SLSP to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Grody and the John Doe Defendants continue to attempt to collect on the fraudulent billing submitted through SLSP to the present day.

223.    SLSP is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by SLSP in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

224.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $391,000.00 pursuant to the fraudulent bills submitted through SLSP.

225.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against Lloyd, Grody, and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

226.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

227.     SLSP is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

228.     Lloyd, Grody, and the John Doe Defendants are employed by and/or associated with SLSP. Lloyd, Grody, and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of SLSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that SLSP was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a psychology practice not legitimately owned, operated, or controlled by a licensed psychologist, but which was unlawfully operated, managed, and controlled by the Grody and the John Doe Defendants for the purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Grody and the John Doe Defendants and the Clinics; (iii) the billed for services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly

misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the Fraudulent Services were provided, to the extent provided at all, by unsupervised "social workers" who were not employed by either Lloyd or SLSP, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

229.    Lloyd, Grody, and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

230.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $391,000.00 pursuant to the fraudulent bills submitted by Defendants through SLSP.

231.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against SLSP, Lloyd, Grody, and the John Doe Defendants**
**(Common Law Fraud)**

232.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

233.    SLSP, Lloyd, Grody, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

234.    The false and fraudulent statements of material fact and acts of fraudulent concealment include the representation that: (i) the billed for services were submitted through a psychology practice that was legitimately owned, operated, or controlled by a licensed psychologist; (ii) the billed for services were provided based upon legitimate decisions by licensed healthcare providers, and not as a result of illegal financial arrangements between the Grody and the John Doe Defendants and the Clinics; (iii) the billed for services were medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the Fraudulent Services were provided in compliance with New York law.

235.    SLSP, Lloyd, Grody, and the John Doe Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through SLSP that were not compensable under New York no-fault insurance laws.

236.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $391,000.00 pursuant to the fraudulent bills submitted by the Defendants through SLSP.

237.    SLSP, Lloyd, Grody, and the John Doe Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

238.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against SLSP, Lloyd, Grody, and the John Doe Defendants
### (Unjust Enrichment)

239.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

240.    As set forth above, SLSP, Lloyd, Grody, and the John Doe Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

241.    When GEICO paid the bills and charges submitted by or on behalf of SLSP for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on SLSP, Lloyd, Grody, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

242.    SLSP, Lloyd, Grody, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that SLSP, Lloyd, Grody, and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

243.    SLSP, Lloyd, Grody, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

244.    By reason of the above, SLSP, Lloyd, Grody, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $391,000.00.

## JURY DEMAND

242.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Tristate PC and SLSP, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Tristate PC and SLSP have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against all Grody and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $128,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Lloyd, Grody, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $128,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Tristate PC, Lloyd, Grody, and the John Doe Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $128,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E.    On the Fifth Cause of Action against Tristate PC, Lloyd, Grody, and the John Doe Defendants for more than $128,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

F.    On the Sixth Cause of Action against Grody and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $391,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.     On the Seventh Cause of Action against Lloyd, Grody, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $391,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.     On the Eighth Cause of Action against SLSP, Lloyd, Grody, and the John Doe Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $391,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper; and

I.     On the Ninth Cause of Action against SLSP, Lloyd, Grody, and the John Doe Defendants for more than $391,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper.

Dated: June 2, 2023

RIVKIN RADLER LLP

By:   /s/ Barry I. Levy
   Barry I. Levy, Esq.
   Michael Vanunu, Esq.
   Colleen O'Neil, Esq.
   Allison N. Stapleton, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*