Barry I. Levy, Esq.
Michael Vanunu, Esq.
Alexandra Wolff, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company, and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                                 Plaintiffs,

            -against-

TRISTATE PSYCHOLOGICAL INJURY SERVICES, P.C.,
SCOTT LLOYD, PH.D. (A Sole Proprietorship), SCOTT
LLOYD, PH.D. a/k/a LANCE GRODY, GARY GRODY a/k/a LANCE GRODY,
NAZIM TARIVERDIEV, KIANAN TARIVERDIEV,
VLADISLAV STOYANOVSKY, DMITRIY KHAVKO,
DILSHOD ISLAMOV a/k/a "DILAN", EDUARD PAKOYS
a/k/a "EDDIE", FINANCIAL VISION CAPITAL GROUP II
LLC f/k/a ADF EQUITIES, LLC, and JOHN DOE
DEFENDANTS "1" - "10",

                                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:1:23-cv-04091-RER-LB

**Plaintiff Demands a Trial by Jury**

## AMENDED COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Tristate Psychological Injury

Services, P.C. ("Tristate"), Scott Lloyd, Ph.D. (a Sole Proprietorship)("SLSP"), Scott Lloyd,

Ph.D. ("Lloyd"), Gary Grody a/k/a Lance Grody ("Grody"), Nazim Tariverdiev ("N. Tariverdiev"), Kianan Tariverdiev ("K. Tariverdiev"), Vladislav Stoyanovsky ("Stoyanovsky"), Dmitriy Khavko ("Khavko"), Dilshod Islamov a/k/a "Dilan" ("Islamov"), Eduard Pakoys a/k/a "Eddie" ("Pakoys"), Financial Vision Capital Group II LLC f/k/a ADF Equities, LLC ("Financial Vision"), and John Doe Defendants "1" through "10" ("John Doe Defendants")(collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $520,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent, unlawful, and otherwise non-reimbursable no-fault insurance charges for purported psychology services, including psychiatric diagnostic evaluations, neurobehavioral status exams, psychological testing, neuropsychological testing, psychotherapy sessions, and record reviews (the "Fraudulent Services"). The Fraudulent Services purportedly were provided to individuals claimed to have been involved in automobile accidents and eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay more than $675,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Defendants Tristate and SLSP (collectively, "Lloyd Entity Defendants") because:

> (i)      the Fraudulent Services were allegedly provided by and billed through the Lloyd Entity Defendants, which are psychological "practices" not under the control and direction of Lloyd, but rather, were at all relevant times operated, managed, and controlled by the Management Defendants (as defined below), Financial Vision and the John Doe Defendants, all of whom are who are unlicensed laypersons, for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

(ii)     the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons and were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to illegal kickback and referral arrangements established between the Management Defendants and the Clinics (as defined below);

(iv)    the Fraudulent Services were not medically justified and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(v)     the claim submissions seeking payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided to Insureds in order to inflate the charges submitted to GEICO and other New York automobile insurers; and

(vi)    the Fraudulent Services were provided, to the extent provided at all, by "social workers" who, were for the most part unlicensed, were never under the supervision of any licensed individual in contravention of New York law and were never employed by the Lloyd Entity Defendants.

3.      Specifically, the Defendants, engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry through which they billed GEICO alone more than $1.25 million through the Lloyd Entity Defendants for the alleged performance of the Fraudulent Services at more than fifteen (15) separate locations from May 2019 through July 2021.

4.      Notably, more than 900 separate bills were submitted to GEICO seeking payment of no-fault benefits for the Fraudulent Services, all of which represented that Lloyd was the legitimate owner of the Lloyd Entity Defendants and that he performed all the Fraudulent Services. In truth, Lloyd performed none of the Fraudulent Services and did not legitimately operate or manage the Lloyd Entity Defendants.

5.     At all relevant times, the Lloyd Entity Defendants and their assets were unlawfully owned, managed and controlled by Grody, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys (collectively, the "Management Defendants"), none of whom are licensed healthcare professionals. Lloyd did not perform any of the Fraudulent Services, did not otherwise treat the Insureds, and did not operate, manage, or control the Lloyd Entity Defendants. Lloyd knowingly permitted unlicensed laypersons – including the Management Defendants – to control the Lloyd Entity Defendants and bill GEICO and other New York automobile insurers using his name and the names of the Lloyd Entity Defendants.

6.     The fraudulent scheme had its origin with Grody who recruited Lloyd, a licensed psychologist, and in exchange for compensation or some other form of financial remuneration, permitted the Management Defendants to use Lloyd's name, professional license, and the Lloyd Entity Defendants as vehicles to submit fraudulent claims seeking payment for no-fault reimbursement to New York automobile insurers, including GEICO. Through the arrangement with the Management Defendants, Lloyd agreed to be a "nominal" owner of the Lloyd Entity Defendants, and Lloyd's nominal ownership served to conceal the true and unlawful ownership and control of the Lloyd Entity Defendants by unlicensed laypersons – including the Management Defendants – in violation of New York law.

7.     The Management Defendants seized on Lloyd's willingness to be the nominal owner of the Lloyd Entity Defendants by concocting a fraudulent treatment and billing scheme pursuant to which:

    (i)     The Management Defendants, along with the John Doe Defendants, participated in illegal referral and kickback arrangements to gain access to patients at more than fifteen (15) multidisciplinary "clinics" located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were

organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics");

(ii)    The Management Defendants arranged to have unlicensed "social workers", who were never employed by the Lloyd Entity Defendants, render the Fraudulent Services at the various Clinics pursuant to a predetermined protocol designed to maximize billing for the Fraudulent Services;

(iii)    the reports, documents, and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services;

(iv)    the billing for the Fraudulent Services would be "funded" through companies, including Financial Vision, in a manner designed to finance the scheme's operation and for the Management Defendants to profit from the fraudulent scheme; and

(v)    funding companies, including Financial Vision, would pay "advances" to accounts controlled by the Management Defendants as against the account receivables associated with the Fraudulent Services, which effectively provided the Financial Vision (and other funding companies) with ownership and control over the assets of the Lloyd Entity Defendants, all post-services activities, and all associated assets (i.e. the claims for Fraudulent Services submitted to automobile insurers, including GEICO), including the collection of the payments made on the claims for Fraudulent Services.

8.    The success of the fraudulent scheme required Lloyd's participation, and therefore, Grody convinced Lloyd to provide, among other things, his signature and medical license, as well as the Lloyd Entity Defendants' names and tax identification numbers ("TIN"). Based on the arrangement, Lloyd would receive a periodic payment in exchange for: (i) allowing his name, license, signature, and the tax identification numbers of the Lloyd Entity Defendants to be used; and (ii) "reviewing" occasional records provided to him by unlicensed "social workers" who worked for Grody. Through this agreement, Lloyd ceded all control of the Lloyd Entity Defendants to the Management Defendants, and to the extent that Lloyd "reviewed" any of the records provided by the social workers, he essentially "rubber stamped" them.

9.      Once Grody obtained the information from Lloyd, the Management Defendants had the information they needed to unlawfully operate, manage and control the Lloyd Entity Defendants and use them as vehicles for submitting bills for the Fraudulent Services to GEICO and other New York automobile insurers.

10.     To finance and profit from the fraudulent scheme, the Management Defendants devised and implemented a series of financial arrangements between Lloyd and various funding companies, including Financial Vision, Ravo Capital LLC, Funding4Doctors LLC, and Plutus Global, Inc. (collectively, the "Funders"), to create false funding arrangements purportedly between the Funders and the Lloyd Entity Defendants. The false funding arrangements included unsigned or fraudulently signed funding agreements and payment directives to permit the Funders to collect the proceeds from insurance companies.

11.     The Funders were perfect partners for the Management Defendants in terms of financing the fraudulent scheme against GEICO and the New York automobile insurance industry because: (i) they were willing to engage in financial transactions to accounts controlled by the Management Defendants without any contact or interaction with Lloyd; and (ii) they could charge exorbitant fees on the monies that they would be advancing as a "premium" for their role and participation as well as their willingness to provide advances at the Management Defendants' direction.

12.     In furtherance of the fraudulent scheme, the Management Defendants and the Funders, including Financial Vision, partnered with New York based collection law firms (the "Collection Lawyers") that agreed to:

    (i)      provide legal representation to Lloyd and the Lloyd Entity Defendants;

(ii)  work with the Funders and Management Defendants to arrange for funding of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme;

(iii)  pursue payment and collection against GEICO and other New York automobile insurers by (a) knowingly submitting fraudulent bills to the insurers for the Fraudulent Services and (b) pursing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid as needed; and

(iv)  accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to the Funders.

13.  The Management Defendants had ongoing relationships with the Collection Lawyers and knew what information would be needed to facilitate the funding, the billing and collections on the fraudulent claims, and profit from the fraudulent scheme.

14.  A New York City based law firm (hereinafter the "FV Law Firm") was the primary law firm among the Collection Lawyers with whom the Management Defendants and Financial Vision were intimately familiar. In addition to purporting to represent Lloyd and the SLSP, the FV Law Firm at all times acted as legal counsel for Financial Vision. Moreover, at the time, several current and former partners of the FV Law Firm held an ownership interest in Financial Vision.

15.  Once the funding and legal relationships were in place, the Management Defendants, Financial Vision, other Funders, and the John Doe Defendants used Lloyd's license, the Lloyd Entity Defendants, and Lloyd's signature to: (i) generate false and fraudulent documents, including assignment of benefit ("AOB") forms and psychological records, to enable them to submit fraudulent no-fault insurance claims to GEICO and other insurers; and (ii) operate the Lloyd Entity Defendants as a billing vehicle through which millions of dollars of

billing for the Fraudulent Services could be submitted to and collected from GEICO and other New York automobile insurers.

16.    As part of the fraudulent scheme, the Management Defendants provided packages of documents, including fraudulent AOBs and psychological records, to the Collection Lawyers. Once these documents were processed by the Collection Lawyers and/or billing companies with whom they associated, into bills (i.e., "NF-3" forms) using the name of the Lloyd Entity Defendants, the Collection Lawyers organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment.

17.    By way of illustration of the Collection Lawyers actions taken on behalf of the Management Defendants and Funders to further the Fraudulent Scheme, the FV Law Firm, purportedly on behalf of Lloyd and the SLSP:

(i)    Acted on their behalf knowing that they had not communicated with Lloyd and only received instructions from the Management Defendants;

(ii)   Acted on their behalf knowing that Lloyd had not provided any oral or written agreement for the FV Law Firm to engage any of the above-described services;

(iii)  Acted on their behalf knowing that Lloyd had not waived the conflicts by the FV Law Firm representing both Financial Vision – as a funding company – and the SLSP – an entity that received funding by Financial Vision;

(iv)   submitted fraudulent bills generated with the fabricated documents, to GEICO and other automobile insurers falsely claiming that the Fraudulent Services were performed by Lloyd and the SLSP;

(v)    systemically pursued payment and collection against GEICO and other New York automobile insurers on behalf of Lloyd and the SLSP, when the SLSP were illegally owned and controlled by the Management Defendants, not Lloyd; and

(vi)   collected insurance payments from GEICO and other New York automobile insurers and deposited the payments into their IOLA/Attorney Trust Account without any authority from Lloyd to collect and as part of a

conscious effort to conceal the dissipation of the insurance proceeds realized from the scheme to the Funders and to themselves.

18.     Once the FV Law Firm started submitting the fraudulent bills to GEICO and other automobile insurers, purportedly on behalf of Lloyd and the SLSP, the law firm at the direction of the Management Defendants would prepare the claim submissions to be funded by Financial Vision. Thereafter, the funding advances would be paid by through the FV Law Firm's IOLA/Attorney Trust Account – on behalf of Financial Vision – to accounts controlled by the Management Defendants.

19.     To maximize the amount of money that the Management Defendants could profit from the fraudulent scheme through the Lloyd Entity Defendants, all of the fraudulent billing submitted to GEICO and other automobile insurers were funded, and the advances were paid to bank accounts that were solely controlled by the Management Defendants.

20.     As set forth herein, the Defendants, at all relevant times, have known that:

(i)     the Lloyd Entity Defendants were not in compliance with all material laws and regulations governing healthcare practices and/or licensing laws as they were at all relevant times operated, managed, and controlled by the Management Defendants, John Doe Defendants, and the Funders, and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of the Management Defendants – unlicensed laypersons – and were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)   the Fraudulent Services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)   the claim submissions seeking payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided to inflate the charges submitted to GEICO; and

(v)   the Fraudulent Services were provided, to the extent provided at all, by unlicensed "social workers" who were not under the supervision of any licensed individual in contravention of New York law and were never employed by the Lloyd Entity Defendants.

21.   Defendants do not now have and have never been eligible to be compensated for the bills they submitted to GEICO through the Lloyd Entity Defendants.

22.   The charts annexed hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims that the Defendants have submitted, or caused to be submitted, through the Lloyd Entity Defendants to GEICO using the United States mails.

23.   Defendants' fraudulent scheme began no later than 2019 and has continued uninterrupted since that time as the Defendants continue to pursue collection against GEICO on the Fraudulent Services through the prosecution of lawsuits and arbitrations.

24.   As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $520,000.00.

## THE PARTIES

### I.   Plaintiffs

25.   Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

26.   Defendant Tristate is a New York psychology services professional corporation with its principal place of business in New York. Tristate was incorporated in New York on or

about February 2, 2019, was purportedly owned and controlled by Lloyd, and was used as a vehicle to submit fraudulent billing to insurance companies, including GEICO.

27.    Defendant SLSP is an unincorporated psychology practice with its principal place of business in New York. SLSP commenced operations on or about January 25, 2021, was purportedly owned and controlled by Lloyd, and was used as a vehicle to submit fraudulent billing to insurance companies, including GEICO.

28.    Defendant Lloyd resides in and is a citizen of New York. At all relevant times, Lloyd was a registered clinical psychologist who purported to provide, or directly supervise, virtually all the Fraudulent Services that were billed to GEICO through the Lloyd Entity Defendants.

29.    Defendant Grody resides in and is a citizen of New York. Grody is not a licensed healthcare professional.

30.    Grody is no stranger to fraudulent insurance schemes. Grody holds himself out to the public to be a licensed clinical psychologist. In fact, Grody is a convicted felon who is not licensed to practice psychology or any other profession in the State of New York. Grody is uniquely familiar with how to manipulate New York's no-fault system to defraud insurance companies out of money for the financial benefit of himself and those with whom he associates.

31.    More specifically, in 2002, Grody was indicted in the Eastern District of New York and ultimately pleaded guilty in 2003 to three (3) separate counts in connection with a previous insurance fraud scheme, which resulted in him: (i) being imprisoned for more than a year and serving a supervised release for a period of three years; and (ii) paying restitution to Allstate Insurance Company of more than $280,000.00. Grody's federal imprisonment did not have the intended deterrent effect as, shortly after he was released, he became involved in a

series of fraudulent insurance schemes that resulted in at least four (4) major automobile insurance companies filing a series of civil recovery actions against him and various others, with more than $10 million in judgments ultimately being entered against him. Upon information and belief, those judgments remain unsatisfied to date, and Grody remains incapable of openly operating within the healthcare industry or engaging in any legitimate activity, thereby contributing to his motive to engage in the furtive, fraudulent, and unlawful conduct described herein.

32.     More recently, Grody has been involved in multiple No-Fault insurance fraud schemes throughout 2021 and 2021 that are virtually identical to the allegations in this Complaint. Grody – and his various accomplices – have been named as Defendants in various lawsuits filed within the Eastern District of New York that – similar to this action – involve recruiting a healthcare provider and using his/her name, professional license, and healthcare practice/sole proprietorship to fraudulently bill GEICO for No-Fault services that were never provided by the healthcare provider.  See e.g. Gov't Emps. Ins. Co. et al. v. Grody et al., 1:22-cv-03598-BMC; Gov't Emps. Ins. Co. et al. v. Tenenbaum et al., 1:22-cv-04543-ARR-PK (the "Tenenbaum Action"); Gov't Emps. Ins. Co. et al. v. Stallings, et al., 1:22-cv-06306-DG-RML (the "Stallings Action"); Gov't Emps. Ins. Co. et al. v. Grody et al., 1:22-cv-068187-RER-PK; Gov't Emps. Ins. Co. et al. v. Bily-Linder et al., 1:23-cv-00515-FB-RML (the "Bily-Linder Action"); Gov't Emps. Ins. Co. et al. v. Puzaitzer et al., 1:23-cv-074565-DLI-VMS (the "Puzaitzer Action"); Gov't Emps. Ins. Co et al. v. Stoyanovsky, et al., 1:24-cv-01017-PKC-JAM; Gov't Emps. Ins. Co. et al. v. Grody et al., 1:24-cv-04125-FB-MMH.

33.     Defendant N. Tariverdiev resides in and is a citizen of New York. N. Tariverdiev is not a licensed healthcare professional. N. Tariverdiev is also the son of Defendant K. Tariverdiev.

34.     Defendant K. Tariverdiev resides in and is a citizen of New York. K. Tariverdiev is not a licensed healthcare professional.

35.     Defendant Stoyanovsky resides in and is a citizen of New York. Stoyanovsky is not a licensed healthcare professional.

36.     Stoyanovsky is no stranger to no-fault insurance schemes.  In 2005, Stoyanovsky and his sham company, LVL Business Group, Inc., were named as defendants in a lawsuit alleging, among other things, that Stoyanovsky conspired with other individuals and sham companies to steal millions of dollars through New York's no-fault system by: (i) laundering millions of dollars through various entities Stoyanovsky and others controlled; (ii) illegally owning and controlling several healthcare professional corporations; and (iii) submitting fraudulent diagnostic testing reports through these illegally owned and controlled healthcare professional corporations to insurance companies for reimbursement.  See Allstate Insurance Company et al. v. Batsiyan et al., 1:05-cv-05933-SJ-VVP (E.D.N.Y. 2005).  Stoyanovsky is also reported to have pleaded guilty to Scheme to Defraud in the Second Degree, a Class A Misdemeanor, in connection with his involvement in a massive scheme, and along with his companies, Physician Transcribing Inc. and LVL Business Group, Inc. were ordered to pay restitution in the amount of over $2.6 million in connection with a criminal case filed by the Kings County District Attorney's Office.

37.     More recently, Stoyanovsky has been named as a defendant – along with Grody – in another lawsuit filed in the Eastern District of New York that relates to No-Fault insurance

schemes involving recruiting a healthcare provider and using his name, professional license, and healthcare practice to fraudulently bill GEICO for No-Fault services that were never provided by the healthcare provider. See Gov't Emps. Ins. Co et al. v. Stoyanovsky, et al., 1:24-cv-01017-PKC-JAM.

38.    Defendant Khavko resides in and is a citizen of New York. Khavko is not a licensed healthcare professional.

39.    Khavko is also no stranger to no-fault insurance schemes. Khavko has also been long associated with the management of schemes involving fraudulent no-fault claims and has been sued by GEICO for his involvement in similar schemes. See e.g. Gov't Emps. Ins. Co. et al. v. Khavko et al., 1:11-cv-05781-JRR-JO.

40.    Defendant Islamov resides in and is a citizen of New York. Islamov is not a licensed healthcare professional.

41.    Defendant Pakoys resides in and is a citizen of New York. Pakoys is not a licensed healthcare professional.

42.    Defendant Financial Vision is a Delaware limited liability company that was formed on or about August 8, 2018, with its principal place of business at 506 Hamburg Turnpike, Ste 204A, Wayne, New Jersey. Financial Vision was originally formed under the name of "ADF Equities, LLC".  On September 26, 2018, a certificate of amendment was filed with the Secretary of State of the State of Delaware and the entity's name was changed from ADF Equities, LLC to Financial Vision. All the members of Financial Vision are residents of New York and/or New Jersey.

43.    Financial Vision is no stranger to fraudulent No-Fault insurance schemes. Financial Vision has been named as a defendant in a separate lawsuit filed in the Eastern District

of New York that relate to No-Fault insurance schemes involving illegal control and ownership of medical practices that were used to bill GEICO and other automobile insurers for excessive and medically unnecessary healthcare services performed at Clinics. See Gov't Emps. Ins. Co. et al. v. Harbor Medical Group, P.C., et al., 2:23-cv-09038-NCM-AYS.

44.    The John Doe Defendants are citizens of New York. The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with Grody, Lloyd, and the Lloyd Entity Defendants and derived financial benefit from the fraudulent scheme.

## JURISDICTION AND VENUE

45.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

46.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

47.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the district where one or more of the Defendants reside and a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

48.    GEICO underwrites automobile insurance in New York.

**I.    An Overview of the Pertinent Law Governing No-Fault Reimbursement**

49.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

50.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

51.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

52.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3".  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

53.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

54.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….  (Emphasis added).

16

55.     In New York, only a licensed psychologist may: (i) practice psychology; (ii) own or control a psychology practice; (iii) employ and supervise other psychologists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

56.     Unlicensed non-psychologists may not: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

57.     New York law prohibits licensed healthcare services providers, including psychologists, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

58.     New York law prohibits unlicensed persons not authorized to practice a profession, like psychology, from practicing the profession and from sharing in the fees for professional services.  See, e.g., New York Education Law § 6512, § 6530(11), and (19).

59.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or it allows unlicensed laypersons to share in the fees for the professional services.

60.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, (ii) only licensed practitioners may practice their profession in New York because of the concern that unlicensed persons are not

bound by "ethical rules" that govern the quality of care; and (iii) insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

61.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

62.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

63.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

64.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

65.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

### A.     The Origin of the Defendants' Fraudulent Scheme and its Components

66.     Lloyd is a psychologist who became licensed in New York in 2015.

67.     Shortly after becoming licensed, Grody recruited Lloyd to participate in a complex insurance fraud scheme to bill GEICO and other New York automobile insurers for purported psychological services provided by unlicensed "social workers". Based on the arrangement between Grody and Lloyd, in exchange for a periodic payment, Lloyd would (i) provide Grody with a psychological practice that Grody could use to bill for purported psychology services performed by unlicensed "social workers" on patients that Grody got access to at various Clinics, and (ii) occasionally review reports from the social workers. In addition to overseeing the "social workers" and gaining access to patients, Lloyd willingly agreed to give Grody control of the financial operations of the Lloyd's psychological practice.

68.     Lloyd was a perfect candidate for this scheme because he was a newly licensed psychologist actively seeking work.

69.     Based on this arrangement, Grody – with the assistance of several John Doe Defendants – used Lloyd's name, license, signature, and the tax identification number of a healthcare practice entitled Lloyd Psychological Services, PLLC ("LPS"), to bill for the

Fraudulent Services performed by unlicensed "social workers" through LPS. The arrangement between Grody and Lloyd, and the use of the LPS as a billing vehicle for Fraudulent Services took place between 2015 and 2019.

70.     In 2019, Lloyd incorporated Tristate and Grody and Lloyd agreed to change the billing for Fraudulent Services from LPS to Tristate. The operations of Tristate were ostensibly the same as with LPS. In exchange for periodic payment from Grody, Lloyd agreed to permit Grody – and the John Doe Defendants – to use Lloyd's name, license, signature, and Tristate to bill for the Fraudulent Services performed by unlicensed "social workers" – to the extent performed at all – and would occasionally review the "social workers'" reports.

71.     Similar to the agreement with LPS, Lloyd willingly agreed to give Grody control of the financial operations of Tristate by providing Grody with access to Tristate's bank and with pre-signed blank checks.

72.     In a "quick hit" fashion, Grody – in association with Lloyd and the John Doe Defendants – submitted billing for the Fraudulent Services through Tristate from May 2019 to July 2019 and from May 2020 to September 2020.

73.     Through the fraudulent scheme through Tristate, Grody, Lloyd, and the John Doe Defendants, were able to profit from the fraudulent billing to GEICO for unnecessary, illusory, and otherwise non-reimbursable psychology services.

74.     Shortly after the Defendants stopped billing GEICO through Tristate, Grody introduced Lloyd to N. Tariverdiev, with whom they discussed continuing the operations of Tristate but through a new psychological entity, the SLSP.

75.     At the time of Grody's introduction by Lloyd to N. Tariverdiev, Grody and N. Tariverdiev had already been working with K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and

Pakoys to unlawfully own and control other healthcare providers and use those healthcare providers as a vehicle to submit fraudulent bills to GEICO and other New York automobile insurers.

76.     For example, the Management Defendants had conducted schemes, similar to the one they planned through SLSP, with other psychology providers, including the practices that were the subject of the Stallings Action as well as the action entitled, Gov't Emps. Ins. Co. et al. v. Karin Gepp, Ph.D. (A Sole Proprietorship), et al., 1:22-cv-02860-ARR-MMH (the "Gepp Action").

77.     Lloyd had agreed, just like he had with Tristate and LPS and in exchange for periodic payments, to permit the Management Defendants to use Lloyd's name, license, signature, and the SLSP to bill GEICO (and other automobile insurers) for the Fraudulent Services performed by unlicensed "social workers" – to the extent performed at all.

78.     Similar to Tristate, the Management Defendants – in association with Lloyd and the John Doe Defendants – submitted billing to GEICO in a "quick hit" fashion for the Fraudulent Services through SLSP from January 2021 to July 2021.

79.     Also similar to the agreement with Tristate, Lloyd willingly agreed to give Grody control of the financial operations of SLSP by transferring all funds purportedly for the benefit of the SLSP to Tristate's bank account, which Grody controlled through pre-signed blank checks and access to the account (the "Tristate Account").

80.     Through the arrangements with the Management Defendants, Lloyd, who, in exchange for periodic payments, willingly permitted the Management Defendants to unlawfully use of Lloyd's name and professional license. As a result, the Defendants were able to bill

GEICO more than $1,284,000.00 for unnecessary, illusory, and otherwise non-reimbursable psychology services.

81.     However, the Lloyd Entity Defendants have never had any legitimate indicia. They had no fixed treatment locations of any kind, did not maintain stand-alone practices, were not the owners or leaseholders in any of the real property from which they purported to provide the Fraudulent Services, did not employ their own support staff, and did not advertise or market their services to the general public.

82.     In fact, at the time that Lloyd purported to provide all of the Fraudulent Services through the Lloyd Entity Defendants – as represented in the bills submitted to GEICO – Lloyd was actually working as employee of another psychological practice.

**B.     Management Defendants Illegal Operation and Control of the Lloyd Entity Defendants**

83.     Once Lloyd agreed to participate in the Fraudulent Scheme through each of the Lloyd Entity Defendants, the Management Defendants took multiple steps to unlawfully operate and control the Lloyd Entity Defendants and use the Lloyd Entity Defendants to bill automobile insurers, including GEICO, for the Fraudulent Services.

84.     In exchange for a set payment, Lloyd ceded control of the Lloyd Entity Defendants to the Management Defendants. The Management Defendants working collaboratively with the John Doe Defendants, Funders and Collection Lawyers, exercised complete and unlawful control over all patient care as well as the financial and operational aspects of the Lloyd Entity Defendants.

85.     Each of the Management Defendants had their own roles in operating the fraudulent schemes through the Lloyd Entity Defendants.

86.    For example, as it relates to Tristate, Grody worked with the John Doe Defendants to control all of the operations of Tristate, including hiring "social workers" to interact with the patients, gaining access to patients through illegal relationships with the Clinics, retaining the Collection Lawyers, overseeing the paperwork associated with the Fraudulent Services, making arrangements with the Funders to obtaining funding, and controlling the Tristate's finances.

87.    As it relates to SLSP, the control of the SLSP was more spread out among the Management Defendants. Each of the Management Defendants had (i) access to various Clinics that would be used for SLSP to gain access to patients, and (ii) had access to additional Collection Lawyers and Ravo Capital, who – to an extent significantly less than Financial Vision – provided funding for the fraudulent scheme. In addition:

(i)    Stoyanovsky had access to Financial Vision, who would provide funding for the fraudulent scheme, and the FV Lw Firm who would act as Collection Lawyers. Stoyanovsky was one of the primary points-of contact for the FV Law Firm when information was needed or when documents required Lloyd's signature.

(ii)    K. Tariverdiev handled the finances of the fraudulent scheme through the SLSP, including distributing monies that were received in cash to himself and the other Management Defendants.

(iii)    N. Tariverdiev and Islamov handled the day-to-day operations of the fraudulent scheme including making sure all paperwork would be submitted to the Collections Lawyers who would submit the bills to GEICO, communicating with the Clinics and the unlicensed "social workers" at the Clinics, communicating with the Collection Lawyers, and acting as the liaison between the Clinics and the Collection Lawyers.

(iv)    Khavko was in charge of the creating the claims submissions that were used to submit the charges for Fraudulent Services to GEICO and other New York automobile insurers.

(v)    Grody oversaw and employed the unlicensed "social workers" who appeared at the Clinics and purported to treat patients on behalf of the SLSP, communicated with Lloyd, controlled the Tristate Account, and – at the direction of N. Tariverdiev and Islamov – issued payments from the

23

Tristate Account for funds that were purportedly for the benefit of the SLSP.

88.    In keeping with the fact that Grody – as an unlicensed layperson – illegally exercised control over the Lloyd Entity Defendants, Grody – through three separate shell companies that he owns – received 48 separate payments, totaling over $270,000.00, from the Tristate Account between July 2019 and July 2021.

89.    In further keeping with the fact that Grody illegally exercised control over the Lloyd Entity Defendants, Grody would obtain insurance company checks that were issued to Lloyd for bills relating to the SLSP and sent to one of the Collection Lawyers, and then deposit those funds into the Tristate Account.

90.    For example:



91.    In keeping with the fact that Pakoys – also an unlicensed layperson – illegally exercised control over the SLSP, Pakoys – through an entity he owns named Medpak Global Services, Inc. ("Medpak") – received three (3) payments from the Tristate Account between

April 1, 2021 and August 10, 2021, totaling approximately $23,000.00. During the same time period, Medpak, which Pakoys has represented was a "consulting business", also received payments from (i) the psychology practices in the Gepp Action and (ii) from one of Grody's shell companies.

92.    In keeping with the fact that Stoyanovsky and Khavko – both of whom were unlicensed laypersons – illegally exercised control over the SLSP, Stoyanovsky and Khavko communicated with the FV Law Firm regarding issues relating to the collection of No-Fault claims for the SLSP, agreements with the FV Law Firm and Financial Vision, and information regarding the funding advances purportedly issued on behalf of Financial Vision.

93.    For example, on August 4, 2021, the FV Law Firm sent an email to Stoyanovsky and Khavko stating that there was a denial by GEICO due to a prior release agreement for LPS, and that the FV Law Firm needed information about whether the prior release impacted SLSP or was solely related to SLSP as this would impact the pending collections. In response, Stoyanovsky responded that the prior agreement was only for LPS. At no point did the FVLaw Firm, Stoyaovsky, or Khavko notify or communicate with Lloyd regarding this issue.

94.    As an additional examples, on March 26, 2021, the FV Law FDirm emailed Stoyanovsky and asked for instructions on where to send funding advances, on behalf of Financial Vision, for the SLSP Claims, and on April 30, 2021, the FV Law Firm advised Stoyanovsky that two "batches" – i.e. groups of bills to insurance companies – were going to be Funded as it relates to the SLSP and other healthcare providers and advised the dollar value of funding advances to be issued on each "batch".

95.    In also keeping with the fact that Khavko illegally exercised control over the SLSP, Khavko received money paid by GEICO, and other automobile insurers, on some of the

claims submitted by the SLSP. Specifically, one of the Collection Lawyers received payments issued to the SLSP, deposited the money into their attorney IOLA/Trust account, and then issued payments to Plutus Global, Inc. ("Plutus Global"), which is owned by Khavko. The payments to Plutus Global were received without any written agreement or oral direction from Lloyd that permitted the Collection Lawyer, Plutus Global or Khavko to collect or receive such payments.

96.    In keeping with the fact that N. Tariverdiev and Islamov – as an unlicensed layperson – illegally exercised control over the SLSP, N. Tariverdiev and Islamov frequently emailed the FV Law Firm, other Collection Lawyers, and unlicensed "social workers" on behalf of the SLSP using the email addresses of probiller2021@gmail.com and 2266office@gmail.com.

97.    For example, N. Tariverdiev and Islamov communicated via email with the FV Law Firm regarding (i) the psychological paperwork to be submitted with the bills from the SLSP to New York automobile insurers, including GEICO, and (ii) claim-specific information that was missing and needed to be included on the No-Fault bills.  N. Tariverdiev and Islamov also communicated via email with the unlicensed "social workers" working at the Clinics regarding the psychological records that would be used in the submission of No-Fault insurance bills.

98.    Unlike the Management Defendants, Lloyd had essentially no involvement in operations of Lloyd Entity Defendants. Lloyd did not: (i) control the finances of the Lloyd Entity Defendants; (ii) visit any of the Clinics where the Lloyd Entity Defendants purportedly operated; (iii) actually meet or treat any of the Insureds; (iv) hire any staff for the Lloyd Entity Defendants; (v) enter into agreements for renting space where the Lloyd Entity Defendants purported to operate from; (vi) enter into any funding agreements for the Lloyd Entity Defendants; (vii) retain any of the Collection Lawyers on behalf of the Lloyd Entity Defendants; (viii) communicate with

any Collection Lawyers regarding the billing or finances of the Lloyd Entity Defendants; and (ix) sign any assignment of benefits ("AOB") forms, medical records, or "superbills" that were included in the documentation supporting the bills submitted to GEICO.

99.     In addition to knowingly providing the Management Defendants with his signature, license, and the information concerning the Lloyd Entity Defendants in exchange for regular payments, Lloyd's involvement was limited to periodically reviewing electronic treatment reports.

### C.     The Illegal Kickbacks to Gain Access to Insureds

100.    In addition to the recruitment of Lloyd and the unlicensed "social workers", the success of the Defendants' fraudulent scheme required the Management Defendants, with the assistance of the John Doe Defendants, to gain access to a large volume of Insureds to whom the unlicensed "social workers" could purport to provide the Fraudulent Services.

101.    However, neither of the Lloyd Entity Defendants was set up to generate their own stand-alone patient base. Instead, the Management Defendants obtained access to Insureds for the Lloyd Entity Defendants and the unlicensed "social workers" through the payment of kickbacks or other financial incentives to the owners/operators of the Clinics and/or to other individuals associated with the Clinics.

102.    In fact, the Management Defendants entered into unlawful referral agreements with the John Doe Defendants and controlled the fraudulent scheme by using the name of Lloyd and the Lloyd Entity Defendants on an itinerant basis in connection with the performance of the Fraudulent Services from more than fifteen (15) separate Clinics, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangement, including the following:

| CLINIC LOCATIONS | | |
|---|---|---|
| 14 No. Main Street | Spring Valley | NY |
| 148-21 Jamaica Avenue | Jamaica | NY |
| 2184 Flatbush Avenue | Brooklyn | NY |
| 245 Rockaway Avenue | Valley Stream | NY |
| 2488 Grand Concourse | Bronx | NY |
| 320 Post Avenue | Westbury | NY |
| 3250 Westchester Avenue | Bronx | NY |
| 33-10 101st Street | Flushing | NY |
| 332 East 149th Street | Bronx | NY |
| 4041 Boston Road | Bronx | NY |
| 55 East 115th Street | New York | NY |
| 60 Belmont Avenue | Brooklyn | NY |
| 6269 99th Street | Queens | NY |
| 647 Bryant Avenue | Bronx | NY |
| 90-16 Sutphin Boulevard | Jamaica | NY |

103.    As a result of the illegal financial and kickback arrangements between the Management Defendants and the John Doe Defendants that controlled the Clinics, the Defendants were provided with access to patients that treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

104.    The Clinics provided facilities for the Lloyd Entity Defendants, as well as a "revolving door" of other psychology providers, healthcare services providers, chiropractic providers, physical therapy providers, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

105.    In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name

beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

106.    At each of the Clinics, the John Doe Defendants, rather than any licensed healthcare professionals, developed and controlled the patient base. Clinics willingly provided patient access to the Lloyd Entity Defendants and the Management Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and, therefore, catered to a high volume of Insureds at the locations.

107.    The Clinics were willing and able to provide the Lloyd Entity Defendants (and other healthcare providers) with access to a large amount of Insureds in exchange for kickbacks or other financial incentives because the John Doe Defendants who controlled the Clinics: (i) established and maintained multiple pipelines that funneled Insureds to their respective locations; and then (ii) entered into agreements with no-fault providers pursuant to which the Clinics provided access to their pools of Insureds in exchange for financial remuneration.

108.    In general, the Clinics, or their representatives, were paid a sum of money by the Management Defendants. The payments were typically made to: (i) shell companies disguised as "transportation" or "marketing" or "rent"; or (ii) to fraudulent healthcare practices disguised as "rent". In reality, the payments were kickbacks for referrals, and the relationships between the Lloyd Entity Defendants and the Clinics were "pay-to-play" arrangements.

109.    In connection with these "pay-to-play" arrangements, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's representatives to one of the unlicensed "social workers" present at the facility for psychological evaluation and testing,

regardless of individual symptoms, presentation, or – in most cases – the total absence of any clinically significant psychological symptoms arising from any automobile accident.

110.    The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to one of the unlicensed "social workers" that was purporting to operate under one of several psychological practices that was given access to the Insureds on a given day pursuant to the unlawful kickback and referral arrangements.

111.    In keeping with the fact that unlawful kickback and referral arrangements existed, the bank account associated with Tristate – that was controlled by Grody – made the following payments:

- The Tristate Account issued ten (10) checks to Alex Transportation Inc. ("Alex Trans") between March 31, 2021, and August 24, 2021, totaling approximately $110,000.00. Despite paying such a large sum of money to a purported "transportation", Alex Trans is not an entity that is licensed by New York City Taxi and Limousine Commission as a for-hire vehicle, which is legally required before performing transportation services.

- The Tristate Account issued six (6) checks to Litardo Admin Inc. ("Litardo") between April 8, 2021, and June 23, 2021, totaling approximately $50,000.00. At the time, Litardo purported to operate from a homeless veterans temporary housing rehabilitation center in Glen Gardener, New Jersey. Notably almost all of the money deposited into Litardo's account was quickly re-issued to various entities, including payments to Alex Trans and a company called DRR Marketing Corp ("DRR Marketing"), which purports to operate out of a residential apartment in Great Neck, New York.

- The Tristate Account issued four (4) checks to Promo & Splash Inc. ("Promo") between April 1, 2021, and July 21, 2021, totaling approximately $44,000.00, including a notation for "advertising". Similar to Litardo, a significant amount of the money deposited was quickly re-issued to various entities, including payments to Alex Trans and DRR Marketing.

112.    The above are just representative samples of the payments made on behalf of the Lloyd Entity Defendants – at the direction of the Management Defendants – representing the

laundering of the funds and the unlawful kickback and referral arrangements with the Clinics, and their representatives.

113.    The unlawful kickback and referral arrangements were essential to the success of the fraudulent scheme. The Defendants derived significant financial benefit from the relationships with the Clinics because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other New York automobile insurers.

114.    The Defendants always knew that the kickbacks and referral arrangements were illegal and, therefore took affirmative steps to conceal the existence of the fraudulent referral scheme and the fraudulent billing.

115.    As a result of this arrangement, the Defendants subjected Insureds at the Clinics to the Fraudulent Services despite there being no clinical basis for the services, had them undergo phony psychological evaluation and testing, all solely to maximize profits without regard to genuine patient care.

116.    In keeping with the fact that the Clinics controlled the patient base and that the Lloyd Entity Defendants were simply two of several interchangeable "cogs" in the fraud wheel, the Lloyd Entity Defendants only operated for short periods of time and were part of a larger group of psychology practices that purported to treat Insureds through the same unlicensed "social workers" and at overlapping Clinic locations. For example, there are overlapping unlicensed "social workers" and Clinic locations between the Lloyd Entity Defendants and the psychology "practices" that are subject to the following actions: (i) the Stallings Action; (ii) the Gepp Action; (iii) the Bily-Linder Action; (iv) the Puzaitzer Action; and (v) the Tenenbaum Action.

### D.    Placing the Fraudulent Scheme Into Motion

117.    To be able to submit the large amounts of billing for the Fraudulent Services to New York automobile insurers, including GEICO, the Management Defendants needed to – among other things – recruit "workers" who would purport to perform the Fraudulent Services.

118.    Grody recruited the largely unlicensed "social workers" to purport to perform the Fraudulent Services on behalf of the Lloyd Entity Defendants at the Clinics, in exchange for nominal payment. This was done, in part, by Grody conducting searches seeking the assistance of people who had recently graduated from school or who had practical experience but could not become licensed in New York for various reasons.

119.    Once an unlicensed "social worker" was recruited, Grody would arrange to have that individual meet him at one of the Clinics. During the meeting, Grody would explain that the position required the individual to travel to various medical clinics to see people who had been in automobile accidents and to ask those people a series of questions and provide them with forms to complete.

120.    Grody told the unlicensed "social workers" they would be paid a day rate for each day that they travelled to the medical clinics and that their work at the medical clinics would be supervised by a licensed psychologist. In fact, supervision by a licensed psychologist never happened. Rather, nearly all the people with whom the unlicensed "social workers" ever had contact at the medical clinics, outside of the patients themselves, worked for the Management Defendants and were not licensed psychologists.

121.    When the "social workers" needed to communicate with anyone regarding the patients purportedly treated by the Lloyd Entity Defendants, they would communicate with Grody and/or N. Tariverdiev. In addition, when the "social workers" completed the patient

records that would be used as the basis to bill New York automobile insurers, including GEICO, they would send the records to Grody and/or N. Tariverdiev.

122.    Unlike the unlicensed "social workers", Lloyd never visited any of the Clinics and never saw any of the patients who were purportedly treated by the Lloyd Entity Defendants.

123.    Once all of the necessary "pieces" were in place – i.e. the unlicensed "social workers" were hired, arrangements to access to Clinics and patients, all the necessary information and signature from Lloyd, and Lloyd ceded control of the Lloyd Entity Defendants to the Management Defendants – the fraudulent scheme was placed into overdrive. The Management Defendants and John Doe Defendants, working collaboratively with the unlicensed "social workers", Funders, and Collection Lawyers, exercised complete control over all financial and operational aspects of the Lloyd Entity Defendants.

124.    One aspect of the complete control over the Lloyd Entity Defendants involved the generation of treatment records that would be used to submit bills to automobile insurers, including GEICO. This involved Grody arranging to have the unlicensed "social workers" go to the Clinics to generate the necessary treatment reports for the unlawfully referred Insureds. Also included in this aspect of the scheme was the Management Defendants and the John Doe Defendants using Lloyd's license number, signature, and the tax identification numbers associated with the respective Lloyd Entity Defendants to fabricate the claim documents necessary to support the fraudulent claim submissions to GEICO and other New York automobile insurers, including assignment of benefits ("AOBs") forms and other medical records.

125.    Another aspect of complete control over the Lloyd Entity Defendants involved arranging to have the account receivables associated with the GEICO billings for the Fraudulent Services "funded" through the Funders, with the assistance of the Collection Lawyers.

126.    The Collection Lawyers purported to represent Lloyd and the Lloyd Entity Defendants when, in reality, the Collections Lawyers were actually "retained" by the Management Defendants. Once retained, the Management Defendants began to provide the Collection Lawyers with the medical records, AOBs and claim-related documents containing Lloyd's signature, when Lloyd never actually signed the documents or performed psychological services.

127.    Using the fraudulent documents obtained from the Management Defendants, the Collection Lawyers generated bills (i.e., NF-3 forms), as well as cover letters in their name that accompanied the bills and other fraudulent documents (i.e. medical records and AOBs) and mailed them to GEICO and other New York automobile insurers using the United States mails.

128.    At the same time, the Management Defendants, with the assistance of the Collection Lawyers, looked for Funders who they could "sell" the Lloyd Entity Defendants' receivables in exchange for immediate payment, referred to as funding advances.

129.    Upon confirmation from the Collection Lawyers of a list of bills that were submitted to automobile insurers, including GEICO, the Funders would issue "advances" purportedly to the Lloyd Entity Defendants, but would ultimately be deposited into the Tristate Account that was controlled by Grody. The advances would then be used by the Management Defendants to directly profit from the fraudulent scheme and to continue operate the fraudulent scheme.

130.    Funders that essentially purchased the only assets belonging to the Lloyd Entity Defendants included Financial Vision, Ravo Capital LLC, Funding4Doctors LLC, and Plutus Global.

131.    The Funders purchased the assets belonging to the Lloyd Entity Defendants without any signed agreement by Lloyd. Instead, the Funders purchased the Lloyd Entity Defendants' receivables based upon agreements directly with the Management Defendants.

132.    As a result of those efforts, the Management Defendants received hundreds of thousands in advances on the claims for the Fraudulent Services from the Funders without any risk, because they were never signatories to the agreements.

133.    For example, as it relates to the SLSP, all of the funding advances were deposited into Lloyd's personal account and then – at the direction of Grody – promptly transferred to the Tristate Account that was controlled by the Management Defendants.

134.    A summary of the funding advances for the SLSP that were ultimately provided to the Tristate Account controlled by the Management Defendants is as follows:

| Funding Advance Date | Funder | Advance Amount | Date of Transfer to Tristate Account | Amount Transfer to Tristate |
|---|---|---|---|---|
| March 31, 2021 | Financial Vision | $143,000.00 | April 1, 2021 | $143,000.00 |
| April 5, 2021 | Financial Vision | $9,070.00 | April 7, 2021 | $9,070.00 |
| April 8, 2021 | Financial Vision | $94,240.00 | April 9, 2021 | $94,240.00 |
| April 30, 2021 | Financial Vision | $90,001.00 | April 30, 2021 | $90,000.00 |
| May 21, 2021 | Ravo Capital | $48,813.00 | May 14, 2021 | $46,000.00 |
| June 2, 2021 | Financial Vision | $50,000.00 | June 3, 2021 | $50,000.00 |
| June 18, 2021 | Financial Vision | $55,837.00 | June 21, 2021 | $55,000.00 |
| June 22, 2021 | Ravo Capital | $70,730.00 | June 22, 2021 | $70,000.00 |

| June 25, 2021 | Financial Vision | $77,105.88 | June 28, 2021 | $77,000.00 |
| July 19, 2021 | Financial Vision | $58,202.00 | July 19, 2021 | $58,202.00 |
| August 4, 2021 | Financial Vision | $50,263.11 | August 6, 2021 | $50,000.00 |
| August 19, 2021 | Financial Vision | $50,077.44 | August 20, 2021 | $50,000.00 |
| | **TOTAL = $797,339.43** | | **TOTAL = $792,512.00** | |

135. By contrast to the Management Defendants, Lloyd only received a small fraction of the funding advances on the claims for Fraudulent Services through the Lloyd Entity Defendants.

136. As part of the arrangement between the Management Defendants, Collection Lawyers, and many of the Funders, including Financial Vision, the Funders would be paid from the Collection Lawyers once payments were received from insurance companies on the claims for Fraudulent Services.

137. The Collection Lawyers would deposit the money obtained from insurers on behalf of the Lloyd Entity Defendants into their Attorney/IOLA Account, and then issue payments to the Funders.

138. In some cases, the payments issued to Funders from the Collection Lawyers to the Funders based upon "payment directives" purportedly by Lloyd. However, such payment directives were either never signed, or contained a signature that was not signed by Lloyd's. In the circumstance with the FV Law Firm and Financial Vision, the FV Law Firm made payments to Financial Vision without any agreement or written directive by Lloyd.

### E.    Financial Vision's Knowing Participation in the Fraudulent Scheme

139. Financial Vision had no employees, only individuals who have a membership interest in the entity. Instead, all of the work performed by Financial Vision was either done by

the members specifically or by individuals employed by the FV Law Firm at the direction of certain partners of the law firm, that also had a membership interest in Financial Vision.

140.    During the entire time that Financial Vision was purportedly involved with funding SLSP, neither Financial Vision nor anyone at the FV Law Firm on Financial Vision's behalf ever spoke with Lloyd regarding the funding arrangements, funding advances, written agreements or other issues regarding funding the SLSP's claims.

141.    Instead, at all times, Financial Vision, through the FV Law Firm, only spoke with the Management Defendants regarding the funding of the SLSP.

142.    Financial Vision knew that the funding arrangements between Financial Vision and the SLSP were a sham, and were solely a means to create the appearance that there were legitimate financing or factoring agreements associated with the account receivables when, in fact, the true purpose was to pay the Management Defendants up front to permit Financial Vision to essentially purchase the assets of the SLSP, thereby controlling the SLSP, and ensure that all monies paid by GEICO and other insurers as a result of the billing for the Fraudulent Services could be provided to Financial Vision, minus what they would need to pay the FV Law Firm.

143.    Notably, the intent of Financial Vision was to use the funding agreement to fully control the assets of SLSP, as the agreement allowed Financial Vision to charge exorbitant interest rates against the "advances" that were to be made against the account receivables as a financial reward for funding the fraudulent scheme. Specifically, the funding agreement permitted Financial Vision to charge 150% of the amount of each advance made, in addition to recovering the full amount advanced.  By reason of this arrangement, SLSP would never be entitled to collect or retain a single dollar.

144.    As additional evidence of Financial Vision's intent to control the SLSP, the funding agreement also included other terms and conditions intended to allow Financial Vision to exercise complete control over all material financial, operational and legal aspects of the practices.

145.    In reality, Financial Vision issued advances to the Management Defendants and collected the money issued to the SLSP by GEICO and other New York automobile insurers without any written agreement or other direct authority from Lloyd.

146.    In keeping with the fact that Financial Vision issued advances and collected payments made by GEICO, and others, to the SLSP without any written or other direct authority from Lloyd, on March 26, 2021, a then-partner of the FV Law Firm and then-member of Financial Vision – issued an email advising, among others: (i) a paralegal at the FV Law Firm; (ii) Stoyanovsky and Khavko; and (iii) the managing partner of the FV Law Firm and also member of Financial Vision, that funding was issued for, among others, three batches of claims associated with the SLSP.

147.    Thereafter, and also on March 26, 2021, the paralegal from the FV Law Firm sent an email to Stoyanovsky and another individual asking for wire instructions where to send the funding advance and advising that the funding agreement for Lloyd was not signed.

148.     Though the funding agreement was not provided to the FV Law Firm, the wire instructions were provided, and a wire for the funding advance for the SLSP was issued using the FV Law Firm's Attorney/IOLA account on March 31, 2021 to Lloyd's personal bank account.

149.    Without any agreement and without any specific direct authority by Lloyd, the FV Law Firm, on behalf of Financial Vision, continued to issue funding advances for the SLSP on various dates, including (i) April 5, 2021 and (ii) April 8, 2021.

150.    On April 19, 2021, well after the "advances" had been made, the paralegal at the FV Law Firm again emailed Stoyanovsky, Khavko, Islamov, and N. Tariverdiev, to advise that Lloyd needed to sign the following documents immediately: (i) the retainer agreement for the SLSP retaining the FV Law Firm as a collection lawyer; (ii) a conflict waiver for the SLSP waiving the conflict of the FV Law Firm representing both SLSP and Financial Vision; and (iii) the funding agreement between the SLSP and Financial Vision.

151.    Notably, no one at the FV Law Firm directly contacted Lloyd to obtain signatures for these documents or to verbally confirm authority – by the FV Law Firm or Financial Vision – to act under the terms of the agreements until the documents were signed.

152.    Despite the fact that the requested documents were not signed, the FV Law Firm, on behalf of Financial Vision, continued to issue funding advances for the SLSP, including an advance on April 30, 2021.

153.    Once again, on May 4, 2021, Stoyanovsky was emailed by a partner from the FV Law Firm informing him that all of the documents for the SLSP were never signed and that they needed Lloyd to sign certain documents.

154.    In fact, the documents were never signed, yet the FV Law Firm, on behalf of Financial Vision, continued to issue funding advances for the SLSP, including advances that were issued on June 2, 2021, June 18, 2021, June 25, 2021, and July 19, 2021.

155.    On August 2, 2021, the paralegal at the FV Law Firm again emailed Stoyanovsky, Khavko, Islamov, and N. Tariverdiev, attached the three (3) documents that needed to be signed and requested that they be back dated to cover their tracks, stating, "Please have attached contracts signed by Scott Lloyd ASAP and date them for February 16, 2021."

156.    The reason that the email requested that the contracts be back dated for February 16, 2021 was because that is when the FV Law Firm and Financial Vision started to operate on behalf of the SLSP – with billing, collections, and financing – at the direction of the Management Defendants and without any authority by Lloyd.

157.    On August 3, 2021, N. Tariverdiev forwarded the documents that required Lloyd's signature to Grody, and Grody then forwarded the documents to Lloyd for signature.

158.    However, Lloyd refused to sign the documents presented by the FV Law Firm and Financial Vision and told Grody _via_ email on August 3, 2021, "This is a funding agreement to advance claims for me guaranteed by me personally giving you a blank check. This has resulted in default and lawsuits and stress. NO WAY."

159.    Despite Lloyd's protest, the FV Law Firm, on behalf of Financial Vision, issued another funding advances for the SLSP on August 4, 2021.  Later that same day, the paralegal at the FV Law Firm again emailed Stoyanovsky indicating that there were missing contracts for the SLSP and attaching a copy of the three documents that needed to be signed.

160.    On August 9, 2021, the generic email address associated with the Management Defendants, 2266office@gmail.com, sent the paralegal at the FV Law Firm an email containing signed copies of all three agreements.

161.    Notably, both the funding agreement and the FV Law Firm retainer were dated for March 1, 2021, despite being emailed on August 9, 2021, and contained the same stamped signature of Lloyd. Even more, the conflict waiver agreement, which also contained the same stamped signature, purports to have been notarized on February 16, 2021.

162.    The following are copies of the signatures from the FV Law Firm and Financial Vision documents:

**FV Law Firm Retainer**                                    **Funding Agreement**

COVERED PERSON

                                                            ADVANCE RECEIVER:

*[signature]*                                               *[signature]*
                                                            Scott Emerson Lloyd
Name: Scott Emerson Lloyd _____
                                                            ADVANCE MAKER:
Title: _____
                                                            FINANCIAL VISION CAPITAL GROUP II LLC
Date: 03/01/21_____

**Conflict Waiver Signature & Notary**

                                                            Receiver:

                                                            *[signature]*
                                                            Scott Emerson Lloyd

State of New York) ss:
County of Kings )

On February 16th, 2021, before me, the undersigned Notary Public, personally appeared
Scott Emerson Lloyd, personally known to me on the basis of satisfactory evidence to be the
individual whose name is subscribed to the within instrument and acknowledged to me that
he/she executed the instrument.

*[signature]*
NOTARY PUBLIC

EDUARD BIRKEVICH
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BI6272387
Qualified in Kings County
My Commission Expires 11-19-2024

163.    Despite the fact that Financial Vision – directly and through the FV Law Firm –
were operating without any legitimately signed agreements, and first were provided with the
agreement on August 9, 2021 (though they were forged), Financial Vision issued over
$625,000.00 in funding advances to the SLSP.

164.    Even more, during the time that Financial Vision operated without a funding
agreement or other direct authority from Lloyd, the FV Law Firm collected over $150,000.00 in
payments from GEICO that were issued to the SLSP, and almost all of those funds were then
distributed to Financial Vision as part of their profits in the scheme.

**F.    The Defendants' Fraudulent Treatment and Billing Protocol**

165.    In addition to the unlawful control over the Lloyd Entity Defendants and the unlawful financial arrangements, and every Insured who was purportedly seen by the Lloyd Entity Defendants was subjected to predetermined and unnecessary psychological services.

166.    Unlicensed "social workers" on behalf of the Lloyd Entity Defendants purportedly subjected Insureds to both a psychological diagnostic evaluation and a neurobehavioral status exam, as well as to other "psychological services" that were provided pursuant to a predetermined protocol.

167.    At the conclusion of each Insured's initial – and oftentimes only – visit with either of the Lloyd Entity Defendants, billing in the amount of either $1,576.14 or $2,490.50 was typically submitted or caused to be submitted by the Management Defendants, with the assistance of the Collection Lawyers, to GEICO, which represented that Lloyd performed all of the Fraudulent Services.

168.    However, Lloyd never performed any of the Fraudulent Services that were billed to GEICO through either of the Lloyd Entity Defendants, and the only "services" that were performed were by unlicensed "social workers".

**1.    The Fraudulent Psychiatric Diagnostic Evaluation Charges**

169.    Once an Insured was referred to an unlicensed "social worker" pursuant to the unlawful financial arrangements with the John Doe Defendants at the Clinics, the unlicensed "social worker" purported to conduct a psychiatric diagnostic evaluation of the Insured.

170.    As set forth in Exhibits "1" and "2", the Defendants then billed the psychiatric diagnostic evaluation to GEICO either through: (i) Tristate, under CPT code 90801, virtually

always resulting in a charge of $194.58; or (ii) SLSP, under CPT code 90791, virtually always resulting in a charge of $305.73.

171.    The charges for the psychiatric diagnostic evaluations identified in Exhibits "1" and "2" were fraudulent in that, as set forth above, the psychiatric diagnostic evaluations were conducted, to the extent conducted at all, pursuant to the improper financial arrangements between the Defendants and the Clinics, and not pursuant to the documented and clinically reasonable needs of the Insureds.

172.    In addition, the charges for the psychiatric diagnostic were fraudulent in that the psychiatric diagnostic evaluations were: (i) medically unnecessary; and (ii) never performed a legitimate manner in the first instance.

### (i)        Basic, Legitimate Psychiatric Diagnostic Evaluations

173.    A psychiatric diagnostic evaluation is an integrated assessment whereby a mental health practitioner elicits patient data and then uses that data to establish a diagnosis and to formulate an individualized treatment plan for that patient.

174.    In a legitimate clinical setting, during a psychiatric diagnostic evaluation, the data necessary to establish a diagnosis and formulate an individualized treatment plan is primarily elicited through a thorough patient interview and mental status examination, and occasionally other sources, including a review of past medical records and/or reports from family members and significant others.

175.    The patient interview is a face-to-face encounter between the mental health practitioner and patient during which the practitioner observes the patient and elicits information regarding the patient's chief complaint, medical history, psychological history, family history, and social history.

176.   The mental status examination is a structured assessment of the patient's behavioral and cognitive functioning. It includes descriptions of the patient's appearance and general behavior, level of consciousness and attentiveness, thought processes, mood and affect, thought and perception, insight and judgment, and higher cognitive function, including memory, intellect, attention, and concentration. Typically, some components of the mental status examination are obtained through observation and other components are obtained through questioning of the patient.

177.   In non-complex cases, a psychiatric diagnostic evaluation consisting of a patient interview and a mental status examination will typically elicit patient data sufficient to establish a diagnosis and formulate an individualized treatment plan for that patient. In an atypical or complex case, where a patient interview and mental status examination results in a differential diagnosis rather than an established diagnosis, a mental health practitioner may choose to incorporate simple self-administered or self-scored inventories, screening tests, or other similar tests to establish a diagnosis. The use of these simple types of inventories/tests are considered part of the evaluation service and are not separately payable as psychological testing.

**(ii)    The Medically Unnecessary Psychiatric Diagnostic Evaluations**

178.   In the claims identified in Exhibits "1" and "2", the vast majority of the Insureds did not suffer clinically significant psychological symptoms as a result of their underlying automobile accidents such that a psychiatric diagnostic evaluation was medically necessary.

179.   In a legitimate clinical setting, a psychiatric diagnostic evaluation is medically necessary when a patient has a psychological illness and/or is demonstrating emotional or behavioral symptoms which manifest in inappropriate behavior patterns or maladaptive

functioning in personal or social settings, when a patient's baseline functioning is altered by suspected illness or symptoms, or when a patient exhibits a sudden and rapid change in behavior.

180.    In keeping with the fact that in the claims identified in Exhibits "1" and "2", the vast majority of the Insureds did not suffer clinically significant psychological symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, the vast majority of the Insureds whom the Defendants purported to treat were involved in very minor, "fender–bender" accidents.

181.    For example, in many of the claims identified in Exhibits "1" and "2", contemporaneous police reports indicated that the Insureds' accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured, or injured at all, in the underlying accidents.

182.    In addition, in many of the claims identified in Exhibits "1" and "2", the Insureds did not seek treatment at any hospital as the result of their accidents, and virtually all of the Insureds who did go to the hospital were briefly observed in the emergency room and then released after a few hours, typically with nothing more serious than a soft tissue injury diagnosis, and no documented psychological symptoms.

183.    It is highly improbable that these trivial "fender-benders" – which practically never resulted in serious physical injury – would have caused clinically significant psychological symptoms such that a psychiatric diagnostic evaluation was medically necessary in any of the Insureds who purportedly experienced them, much less in multiple Insureds involved in the same relatively minor accidents identified in Exhibits "1" and "2".

184.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, oftentimes with two or more Insureds involved in the same relatively minor accident

presenting for psychiatric diagnostic evaluations at one of the Lloyd Entity Defendants on or about the exact same dates several weeks or even months after their accidents.

185.    Even so, in keeping with the fact that the psychiatric diagnostic examinations purportedly conducted by the unlicensed "social workers" and the Defendants were medically unnecessary, the unlicensed "social workers" and the Defendants frequently purported to conduct psychiatric diagnostic evaluations on two or more Insureds involved in the same minor accident, on or about the same day, often many weeks and even months after the underlying accident, and at the conclusion of the psychiatric diagnostic evaluations, issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to the Insureds.

186.    For example:

(i)    On July 20, 2019, <u>four</u> Insureds – VB, NB, OS, and SU – were involved in a relatively minor automobile accident. Thereafter, VB, NB, OS, and SU presented on July 23, 2019 to Tristate for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to VB, NB, OS, and SU.

(ii)    On January 16, 2020, two Insureds – MR and JW – were involved in a relatively minor automobile accident. Thereafter, <u>six months later</u>, MR and JW presented on July 28, 2020 to Tristate for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to MR and JW.

(iii)    On February 14, 2020, two Insureds – DS and TS – were involved in a relatively minor automobile accident. Thereafter, <u>five months later</u>, DS and TS presented on July 2, 2020 to Tristate for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and

recommended substantially similar courses of medically unnecessary "treatment" to DS and TS.

(iv)     On May 25, 2020, two Insureds – BC and LR – were involved in a relatively minor automobile accident. Thereafter, <u>one month later</u>, BC and LR presented on June 24, 2020 to Tristate for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to BC and LR.

(v)      On July 1, 2020, two Insureds – CC and MF – were involved in a relatively minor automobile accident. Thereafter, <u>more than a month later</u>, CC and MF presented on August 11, 2020 to Tristate for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to  CC and MF.

(vi)     On October 13, 2020, two Insureds – DV and MV – were involved in a relatively minor automobile accident. Thereafter, <u>more than five months later</u>, DV and MV presented on March 25, 2021 to Tristate for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to DV and MV.

(vii)    On January 28, 2021, two Insureds – SS and SY – were involved in a relatively minor automobile accident. Thereafter, <u>more than four months later</u>, SS and SY presented on June 1, 2021 to Tristate for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to SS and SY.

(viii)   On March 16, 2021, two Insureds – HI and LI – were involved in a relatively minor automobile accident. Thereafter, <u>more than a month later</u>, HI and LI presented on April 20, 2021 to Tristate for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and

recommended substantially similar courses of medically unnecessary "treatment" to HI and LI.

(ix)    On March 16, 2021, two Insureds – AF and MG – were involved in a relatively minor automobile accident. Thereafter, <u>more than two months later</u>, AF and MG presented on May 18, 2021 to Tristate for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to AF and MG.

(x)    On May 18, 2021, three Insureds – MC, MJ, and LJ – were involved in a relatively minor automobile accident. Thereafter, <u>more than a month later</u>, MC, MJ, and LJ presented on June 29, 2021 to Tristate for psychiatric diagnostic evaluations by an unlicensed "social worker". At the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social worker" and the Defendants issued substantially identical "diagnoses" and recommended substantially similar courses of medically unnecessary "treatment" to MC, MJ, and LJ.

187.    These are only representative examples. In the claims for psychiatric diagnostic evaluations that are identified in Exhibits "1" and "2", the unlicensed "social workers" and the Defendants often purported to conduct psychiatric diagnostic evaluations of two or more Insureds involved in the same minor accident, on or about the same day, often many weeks and even months after the underlying accident, and at the conclusion of the psychiatric diagnostic evaluations, issue substantially identical "diagnoses" and recommend substantially similar courses of medically unnecessary "treatment" to the Insureds.

**(iii)**    **The Psychiatric Diagnostic Evaluations Were Never Conducted in a Legitimate Manner in the First Instance**

188.    In addition to being medically unnecessary, the charges that the Defendants submitted or caused to be submitted to GEICO for the purported psychiatric diagnostic evaluations, as identified in Exhibits "1" and "2", falsely represented that the evaluations were performed in a legitimate manner in the first instance.

189.    As set forth above, in a legitimate clinical setting, a psychiatric diagnostic evaluation generally entails gathering history, reviewing records, and carrying out a clinical interview and mental status examination, and then using that data to formulate a diagnosis and treatment plan.

190.    In keeping with the fact that the psychiatric diagnostic evaluations were never legitimately performed in the first instance, the unlicensed "social workers" and the Defendants did not conduct a legitimate clinical interview of any Insured during the purported psychiatric diagnostic evaluations.

191.    For example, to the extent the unlicensed "social workers" and the Defendants performed a clinical interview of any Insured at all, the unlicensed "social workers" and the Defendants used template forms with limited parameters in conducting the "interviews".

192.    In fact, the clinical interview portions of the psychiatric diagnostic evaluations, to the extent performed at all, were not meant to have any legitimate benefit for the Insureds that treated with the Lloyd Entity Defendants, but rather were only conducted in order to establish a basis for the charges submitted under CPT codes 90719 and 90801, as well as for the additional Fraudulent Services to which the unlicensed "social workers" and the Defendants purported to subject the Insureds, including psychological and/or neuropsychological "testing".

193.    For example, irrespective of any data elicited through the putative clinical interviews, the psychological evaluation reports submitted through the Lloyd Entity Defendants all contained boilerplate language and findings. Only the Insureds' respective background information was unique to any particular patient.

194.    For instance, virtually every report submitted through Tristate to GEICO contained the following boilerplate language:

"Initial Treatment Process Note"

At the time of evaluation, the above named patient reported a number of symptoms that had developed or worsened since the motor vehicle accident. Several of these symptoms present at clinically significant levels and are currently impairing the patient's adaptive functioning. It has been recommended for the patient to minimize the trauma, develop coping skills and address anxiety. A major aim of the session was to develop a therapeutic alliance between patient and therapist. During the initial evaluation patient was provided with psychoeducation and brief supportive therapy.

195.    In addition, virtually every psychiatric diagnostic evaluation report submitted through Tristate to GEICO checked off the exact same "Target Symptoms", "Functional/Behavioral Challenges", "Therapeutic Goals", "Specific Clinical Interventions", and "Suggested Behavioral Approached".

196.    For example:

197.    What is more, virtually every psychiatric diagnostic evaluation report submitted through SLSP to GEICO, contained the following boilerplate statement:

> Given [name of Insured] above noted current psychological complaints in relation to [his/her] accident, the following battery of tests were administered to provide validation of diagnoses, provide baseline measures for [his/her] functioning, and determine prognosis. Further the results will be used to aid clinical decision-making during treatment. As there are no assessment instruments specifically designed and validated for the personal injury evaluations, the tests in this battery are chosen with consideration of the unique symptoms and psychopathology found in personal injury claimants. All relevant tests used are shown to have good reliability and validity.

198.    In addition, and also in keeping with the fact that the charges that the Defendants submitted for the purported psychiatric diagnostic evaluations falsely represented that the evaluations were performed in a legitimate manner, at the conclusion of the purported psychiatric diagnostic evaluations, the unlicensed "social workers" and the Defendants assigned the vast majority of Insureds a phony "diagnosis" of either an adjustment disorder or a pain disorder with related psychological factors, purportedly as a result of trauma incurred during a minor automobile accident. The Insureds received these phony "diagnoses" regardless of their

individual circumstances or unique presentation. In actuality, the vast majority of Insureds did not suffer from any clinically significant psychological symptoms as a result of the minor automobile accidents they supposedly experienced.

199.    What is more, boilerplate treatment plans given to all patients at the conclusion of psychiatric diagnostic evaluations are not valid treatment plans. Even so, and in keeping with the fact that the psychiatric diagnostic evaluations were not legitimately performed, after assigning phony "diagnoses" to the Insureds, rather than providing each Insured with an individualized treatment plan based on the Insured's individual circumstances, symptomology, and presentation, the unlicensed "social workers" and the Defendants provided virtually every Insured with the exact same boilerplate treatment plan, differing only based upon whether the Insured treated with Tristate or SLSP.

200.    For instance, at the conclusion of their purported psychiatric diagnostic evaluations, virtually every Insured who treated with Tristate was issued a treatment plan that consisted of supportive psychotherapy and relaxation therapy once per week.

201.    In addition, at the conclusion of their purported psychiatric diagnostic evaluations, virtually every Insured who treated with SLSP was issued the following boilerplate treatment plan:

> [Name of Insured] should receive Supportive Psychotherapy through Cognitive-Behavioral Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with disability and regulate pain levels.

### 2.    The Fraudulent Neurobehavioral Status Exam Charges

202.    On the same dates of service that Insureds in the claims identified in Exhibits "1" and "2" were purportedly subjected to "psychiatric diagnostic evaluations," the unlicensed

"social workers" and the Defendants purported to provide those same Insureds with "neurobehavioral status exams."

203.    The purported neurobehavioral status exams were then billed to GEICO in the following manner:

> (i)    in the claims identified in Exhibit "1", Lloyd, Grody, and the John Doe Defendants, through Tristate, routinely submitted or caused to be submitted to GEICO billing for a six (6) hour neurobehavioral status exam under CPT 96116, virtually always resulting in a charge of $1,237.44; and

> (ii)    in the claims identified in Exhibit "2", the Defendants, through the SLSP, routinely submitted or caused to be submitted to GEICO billing for a one (1) hour neurobehavioral status exam under CPT 96116, virtually always resulting in a charge of $324.07.

204.    A "neurobehavioral status exam" is a neuropsychological assessment that provides information about diagnosis, prognosis, and treatment of disorders that are known to impact the central nervous system functioning and predict functional abilities across a variety of disorders.

205.    The use of CPT code 96116 represents that a physician or other licensed healthcare professional conducted a neurobehavioral assessment consisting of: (i) a face-to-face assessment of a patient's thinking, reasoning, and judgment; (ii) administration, grading, and interpretation of individualized neuropsychological testing; and (iii) preparation of a written report.

206.    The charges for the neurobehavioral status exams identified in Exhibits "1" and "2" were fraudulent in that, as set forth above, the neurobehavioral status exams were conducted, to the extent conducted at all, pursuant to the improper financial arrangements between the Defendants and the Clinics, and not pursuant to the documented and clinically reasonable needs of the Insureds.

207.    In addition, the charges for the neurobehavioral status exams identified in Exhibits "1" and "2" were fraudulent in that the neurobehavioral status exams were: (i) medically unnecessary; and (ii) never legitimately performed in the first instance.

**(i)    The Medically Unnecessary Neurobehavioral Status Exams**

208.    In a legitimate clinical setting, a neurobehavioral status exam is medically necessary when, among other things: (a) trauma-based cognitive impairment is suspected; (b) the questions to be addressed though the neurobehavioral status exam cannot be answered through means of a conventional psychiatric diagnostic evaluation; and (c) the results of the testing are likely to have a direct and significant impact on the clinical management of the patient.

209.    In keeping with the fact that the neurobehavioral status exams purportedly performed by the unlicensed "social workers" for which billing was then submitted through the Lloyd Entity Defendants to GEICO were not medically necessary, the unlicensed "social workers" and the Defendants purported to conduct neurobehavioral status exams on virtually every Insured, as a matter of course, even in the absence of cognitive impairment symptoms.

210.    For example:

(i)    On or about January 29, 2020, an Insured named IG was involved in an automobile collision. Thereafter, on June 25, 2020, IG presented at Tristate for a psychiatric diagnostic evaluation. Though at the time of the evaluation, IG reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on IG. Billing was then submitted through Tristate to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(ii)    On or about February 12, 2020, an Insured named NS was involved in an automobile collision. Thereafter, on July 2, 2020, NS presented at Tristate for a psychiatric diagnostic evaluation. Though at the time of the evaluation, NS reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on NS. Billing was

then submitted through Tristate to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(iii)    On or about February 20, 2020, an Insured named TN was involved in an automobile collision. Thereafter, on July 16, 2020, TN presented at Tristate for a psychiatric diagnostic evaluation. Though at the time of the evaluation, TN reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on TN. Billing was then submitted through Tristate to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(iv)    On or about February 21, 2020, an Insured named LD was involved in an automobile collision. Thereafter, on June 8, 2020, LD presented at Tristate for a psychiatric diagnostic evaluation. Though at the time of the evaluation, LD reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on LD. Billing was then submitted through Tristate to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(v)    On or about March 28, 2020, an Insured named JP was involved in an automobile collision. Thereafter, on May 29, 2020, JP presented at Tristate for a psychiatric diagnostic evaluation. Though at the time of the evaluation, JP reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on JP. Billing was then submitted through Tristate to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(vi)    On or about April 12, 2020, an Insured named YJ was involved in an automobile collision. Thereafter, on May 22, 2020, YJ presented at Tristate for a psychiatric diagnostic evaluation. Though at the time of the evaluation, YJ reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on YJ. Billing was then submitted through Tristate to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(vii)    On or about May 6, 2020, an Insured named AW was involved in an automobile collision. Thereafter, on June 24, 2020, AW presented at Tristate for a psychiatric diagnostic evaluation. Though at the time of the evaluation, AW reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on AW. Billing was

then submitted through Tristate to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(viii)   On or about May 30, 2020, an Insured named MM was involved in an automobile collision. Thereafter, on June 30, 2020, MM presented at Tristate for a psychiatric diagnostic evaluation. Though at the time of the evaluation, MM reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on MM. Billing was then submitted through Tristate to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(ix)   On or about July 20, 2020, an Insured named TE was involved in an automobile collision. Thereafter, on August 3, 2020, TE presented at Tristate for a psychiatric diagnostic evaluation. Though at the time of the evaluation, TE reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on TE. Billing was then submitted through Tristate to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(x)   On or about August 3, 2020, an Insured named CB was involved in an automobile collision. Thereafter, on September 15, 2020, CB presented at Tristate for a psychiatric diagnostic evaluation. Though at the time of the evaluation, CB reported no "mem[ory]/cog[native]/decision making difficulty", an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on CB. Billing was then submitted through Tristate to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xi)   On or about December 2, 2020, an Insured named JP was involved in an automobile collision. Thereafter, on January 25, 2021, JP presented at SLSP for a psychiatric diagnostic evaluation. Though JP reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on JP. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xii)   On or about December 24, 2020, an Insured named AR was involved in an automobile collision. Thereafter, on January 26, 2021, AR presented at SLSP for a psychiatric diagnostic evaluation. Though AR reported no cognitive symptoms at the time of the evaluation, and though his speech

was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on AR. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xiii)    On or about December 24, 2020, an Insured named LB was involved in an automobile collision. Thereafter, on January 27, 2021, LB presented at SLSP for a psychiatric diagnostic evaluation. Though LB reported no cognitive symptoms at the time of the evaluation, and though her speech was "clear", her motor activity was "normal", she was "oriented x4", her thought process was "logical", she was "alert" and "attentive", and she displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on LB. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xiv)    On or about January 18, 2021, an Insured named AG was involved in an automobile collision. Thereafter, on January 25, 2021, AG presented at SLSP for a psychiatric diagnostic evaluation. Though AG reported no cognitive symptoms at the time of the evaluation, and though her speech was "clear", her motor activity was "normal", she was "oriented x4", her thought process was "logical", she was "alert" and "attentive", and she displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on AG. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xv)    On or about February 23, 2021, an Insured named KW was involved in an automobile collision. Thereafter, on March 17, 2021, KW presented at SLSP for a psychiatric diagnostic evaluation. Though KW reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on KW. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xvi)    On or about March 3, 2021, an Insured named MS was involved in an automobile collision. Thereafter, on March 17, 2021, MS presented at

SLSP for a psychiatric diagnostic evaluation. Though MS reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on MS. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xvii)   On or about April 1, 2021, an Insured named EE was involved in an automobile collision. Thereafter, on July 1, 2021, EE presented at SLSP for a psychiatric diagnostic evaluation. Though EE reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on EE. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xviii)  On or about April 24, 2021, an Insured named CS was involved in an automobile collision. Thereafter, on May 4, 2021, CS presented at SLSP for a psychiatric diagnostic evaluation. Though CS reported no cognitive symptoms at the time of the evaluation, and though her speech was "clear", her motor activity was "normal", she was "oriented x4", her thought process was "logical", she was "alert" and "attentive", and she displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on CS. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xix)    On or about May 6, 2021, an Insured named JL was involved in an automobile collision. Thereafter, on June 2, 2021, JL presented at SLSP for a psychiatric diagnostic evaluation. Though JL reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on JL. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

(xx)   On or about June 20, 2021, an Insured named GJ was involved in an automobile collision. Thereafter, on June 21, 2021, GJ presented at SLSP for a psychiatric diagnostic evaluation. Though GJ reported no cognitive symptoms at the time of the evaluation, and though his speech was "clear", his motor activity was "normal", he was "oriented x4", his thought process was "logical", he was "alert" and "attentive", and he displayed "appropriate" perception and "intact" memory, an unlicensed "social worker", representing to be Lloyd, purported to conduct a neurobehavioral status exam on GJ. Billing was then submitted through SLSP to GEICO for both a psychiatric diagnostic evaluation and a neurobehavioral status exam.

211.   These are only representative samples.

212.   In the claims neurobehavioral status exams that are identified in Exhibits "1" and "2", an unlicensed "social worker" and the Defendants routinely purported to contemporaneously conduct neurobehavioral status exams and psychiatric diagnostic evaluations on Insureds, often in the complete absence of clinically significant psychiatric symptoms or cognitive impairment resulting from the Insureds' underlying automobile collisions.

213.   What is more, and in keeping with the fact that the neurobehavioral status exams were medically unnecessary, the unlicensed "social workers" and the Defendants purported to provide both a psychiatric diagnostic evaluation and a neurobehavioral status exam to virtually every Insured on the same dates of service, as a matter of course, and without any individualized determination that the psychiatric diagnostic evaluations failed to address any question or questions central to the Insureds' diagnosis and treatment.

214.   In further keeping with the fact that the neurobehavioral status exams were not medically necessary, not only did the results of the testing not have a "direct and significant impact" on the clinical management of any Insured, they had no impact whatsoever.

215.   For instance, as set forth above, regardless of the "results" of the purported neurobehavioral status exams, at the conclusion of the exams, the unlicensed "social workers"

and the Defendants assigned the Insureds bogus diagnoses and provided boilerplate treatment plans, as a matter of course.

### (ii)    The Neurobehavioral Status Exams That Were Never Conducted in a Legitimate Manner in the First Instance

216.    In addition to the neurobehavioral status exams being medically unnecessary, the charges that the Defendants submitted or caused to be submitted to GEICO for the purported neurobehavioral status exams, as identified in Exhibits "1" and "2", falsely represented that the exams were conducted in a legitimate manner in the first instance.

217.    As set forth above, in a legitimate clinical setting, a neurobehavioral status exam generally entails: (i) a face-to-face assessment of a patient's thinking, reasoning, and judgment; (ii) administration, grading, and interpretation of individualized neuropsychological testing; and (iii) preparation of a written report.

218.    In keeping with the fact that the neurobehavioral status exams for which charges were submitted through the Lloyd Entity Defendants to GEICO were not performed in a legitimate manner in the first instance, the unlicensed "social workers" and the Defendants never performed a face-to-face assessment of any Insured for the purposes of assessing the Insured's thinking, reasoning, and judgement. In fact, the only face-to-face interaction that the unlicensed "social workers" had with any Insured was during the patient interviews purportedly conducted as part of the psychiatric diagnostic evaluations. As set forth above, the face-to-face interviews performed during the psychiatric diagnostic evaluations were perfunctory, conducted according to templates and checklists consisting of limited parameters, and not intended to elicit any information that would significantly affect the diagnosis or treatment of any Insured, including information regarding the Insured's thinking, reasoning, and judgment.

219.    What is more, and in further keeping with the fact that the neurobehavioral status exams were not performed in a legitimate manner the first instance, the unlicensed "social workers" and the Defendants never administered, graded, and interpreted individualized neuropsychological testing as part of the neurobehavioral status exams. Instead, the unlicensed "social workers" and the Defendants purported to provide an identical battery of "neuropsychological testing" to virtually every Insured who treated with either Tristate or SLSP, without regard to any Insured's individual circumstances or presentment.

220.    In particular, the unlicensed "social workers" and the Defendants purported to perform the following "neuropsychological testing" on virtually every Insured who treated with Tristate:

(i)     Beck Anxiety Inventory ("BAI") – a twenty-one question self-report used to evaluate the symptoms of anxiety. A BAI typically takes ten to fifteen (10-15) minutes to administer;

(ii)    Beck Depression Inventory – II ("BDI") – a twenty-one question self-report used to evaluate the symptoms of depression. A BDI typically takes ten to fifteen (10-15) minutes to administer;

(iii)   PCL-C ("PTSD Checklist") – a 17-item self-reporting rating scale used to evaluate symptoms of PTSD. A PTSD Checklist typically takes five to ten (5-10) minutes to administer; and

(iv)    Montreal Cognitive Assessment ("MoCA") – a rapid screening instrument that assesses mild cognitive dysfunction. A MoCA typically takes ten (10) minutes to administer.

221.    In addition, the unlicensed "social workers" and the Defendants purported to perform the following "neuropsychological testing" on virtually every Insured who treated with SLSP:

(i)     Short Blessed Test ("SBI") – a simple 6-question screening tool that assesses cognitive changes associated with dementia. An SBT typically takes five to ten (5-10) minutes to administer;

(ii)     BAI – see ¶ 119(i) above;

(iii)     BDI – see ¶ 119(ii) above;

(iv)     Beck Hopelessness Scale ("BHS") – a set of 10-20 true/false questions used to assess a patient's mental state with regards to the future, motivation, and expectations. A BHS typically takes ten to fifteen (10-15) minutes to administer;

(v)     Pain Disability Index ("PDI") – a 7-item self-report instrument that helps measure the impact chronic pain has on a person's life activities. A PDI typically takes approximately five (5) minutes to administer;

(vi)     Posttraumatic Stress Disorder Checklist for DSMI-5 ("PCL-5") – a 20-item self-report measure that assesses the 20 DSM-5 symptoms of PTSD. A PCL-5 typically takes five to ten (5-10) minutes to administer;

(vii)     Health Status Questionnaire 1.0 ("HSQ") – a 39-item multiple choice test used to assess health attributes, health status change, and risk of depression. An HSQ typically takes five to ten (5-10) minutes to administer; and

(viii)     Psychological Inflexibility in Pain Scale (PIPS) – a 16-item scale used to assess psychological inflexibility in people with chronic pain. A PIPS typically takes approximately five to ten (5-10) minutes to administer.

222.     Finally, and in further keeping with the fact that the unlicensed "social workers" and the Defendants never conducted a neurobehavioral status exam in a legitimate manner in the first instance, the unlicensed "social workers" and the Defendants never drafted a legitimate written, interpretive report reflecting the purported neurobehavioral status exams.

223.     In fact, the only written "reports" submitted through the Lloyd Entity Defendants to GEICO were the purported psychiatric diagnostic evaluation reports discussed above.

224.     To the extent that the psychiatric diagnostic evaluation reports submitted through the Lloyd Entity Defendants to GEICO at all addressed the purported neurobehavioral status exams, the reports merely included the Insureds' putative test "scores" with no legitimate substantive analysis.

225.    For example, though virtually all of the written reports submitted through SLSP contained a section labelled "Impressions", the section merely consisted of the following boilerplate language that was copied from one Insured's report to the next and which does not in any way reference cognitive impairment:

> Impressions: According to the preliminary results, [name of Insured] is suffering from emotional and behavioral problems in addition to physical outcomes of the accident. These symptoms are consequently and casually related to the accident on [date of underlying accident].

226.    What is more, as set forth above, the written reports submitted through Tristate to GEICO were comprised of nothing more than some identifying information about the respective Insureds and their accidents, a boilerplate "Initial Treatment Progress Note", virtually the same exact checked off "Target Symptoms", "Functional/Behavioral Challenges", "Therapeutic Goals", "Specific Clinical Interventions", and "Suggested Behavioral Approached", and a boilerplate "treatment plan." Not included in the reports was any analysis of any Insured's neurobehavioral status or cognitive impairment.

### (iii)    Tristate's Misrepresentations Regarding the Amount of Time Spent on Neurobehavioral Status Exams

227.    Furthermore, charges for the neurobehavioral status exams that were submitted by the Defendants through Tristate to GEICO, as identified in Exhibit "1", were also fraudulent because – notwithstanding the Defendants' misrepresentations that the exams virtually always took six (6) hours to perform – the exams never took more than one (1) hour to conduct, to the extent conducted at all.

228.    In particular, virtually every bill for a six (6) hour neurobehavioral status exam submitted through Tristate to GEICO included a "superbill" that allocated the billed time in the following manner: (i) "Face to Face Administration" – one (1) hour; (ii) "Scoring" – one (1) hour

and thirty (30) minutes; (iii) "Interpretation" – three (3) hours; and (iv) "Report Prep" – one (1) hour.

229.    For example:

TRISTATE PSYCHOLOGICAL INJURY SERVICES, P.C.

SUPERBILL

Neurobehavioral Status Exam billed as 96116 which includes:

Face To Face Administration: 1 hour

Scoring:  1 hour 30 min

Interpretation: 3 hour

Report Prep: 1 hour

Scott Lloyd, Ph. D.

09.15.2020
Date

230.    In fact, the unlicensed "social workers", on behalf of Tristate did not spend (i) one (1) hour conducting "face to face administration" of neuropsychological testing. Rather, in virtually every case, at most, the unlicensed "social workers" personally administered the 1-page MoCA to the Insured, a process that typically takes ten (10) minutes to complete. The three (3) remaining tests (BAI, BDI-2, and PTSD Checklist) were not administered face-to-face by the unlicensed "social workers", but rather were automatically distributed to the Insureds by the front desk receptionists at the Clinics, and the Insureds typically filled them out before even meeting any of the unlicensed "social workers".

231.    Nor did the unlicensed "social workers" on behalf of Tristate spend one (1) hour and thirty (30) minutes "scoring" the four (4) tests, but rather just minutes.

232.    In keeping with the fact that the unlicensed "social workers", on behalf of Tristate only spent, at most, minutes "scoring" an Insured's tests, scoring of the: (i) BAI involves nothing

more than tabulating the overall score where the patient assigned a value between zero (0) and three (3) to twenty-one (21) symptoms; (ii) BDI-2 involves nothing more than tabulating the overall score where the patient assigned a value between zero (0) and three (3) to twenty-one (21) feelings; (iii) PCL-C involves nothing more than tabulating the overall score where the patient assigned a value between one (1) and five (5) to seventeen (17) stressful life experience; and (iv) MoCA scoring is performed contemporaneously with the administration of the test, which typically takes ten (10) minutes to complete.

233.    What is more, though Tristate's billing represents that Lloyd, through Tristate spent three (3) "interpreting" each Insured's test results, in fact, the unlicensed "social workers" on behalf of Tristate performed no interpretation of test results.

234.    In keeping with the fact that the unlicensed "social workers", on behalf of Tristate, performed no interpretation of test results, as set forth above, the unlicensed "social workers", Lloyd, Grody, the John Doe Defendants, and Tristate assigned each Insured a bogus diagnosis and boilerplate treatment plan, irrespective of any Insured's test results.

235.    Finally, the unlicensed "social workers", on behalf of Tristate, spent, at most, a few minutes preparing a written report reflecting each Insured's purported neurobehavioral status exam – not one (1) hour per report. In fact, the written neurobehavioral status exam reports submitted through Tristate to GEICO consisted of nothing more than one (1) page containing information cut and pasted from the Insured's psychiatric diagnostic evaluation report and the Insured's completed test papers.

### 3.    SLSP's Fraudulent Charges for Psychological Testing and Neuropsychological Testing

236.    Not only did the Defendants submit or cause to be submitted improper billing for psychiatric diagnostic evaluations and neurobehavioral status exams through SLSP, the

unlicensed "social workers", at the direction of the Management Defendants, and on behalf of the SLSP, also purported to provide those same Insureds with a battery of needless psychological tests and neuropsychological tests (collectively the "Psych Testing").

237.    The Management Defendants, on behalf of the SLSP then billed or caused to be billed to GEICO: (i) the psychological testing under CPT code 96101, virtually always for four (4) hours of testing, at a rate of $290.12 per hour; and (ii)  the neuropsychological testing under CPT code 96118, virtually always for two (2) hours of testing, at a rate of $350.11 per hour. In total, this resulted in routine charges of $1,860.70.22 per round of Psych Testing, separate and apart from the charges for psychiatric diagnostic evaluations and neurobehavioral status exams, per Insured who treated with SLSP.

(i)    **SLSP's Medically Unnecessary Psych Testing**

238.    Similar to the charges for the psychiatric diagnostic evaluations and neuropsychological status exams, the charges for the Psych Testing were fraudulent inasmuch as the Psych Testing was medically unnecessary, and was conducted, to the extent conducted at all, pursuant to a pre-determined fraudulent treatment protocol and kickback arrangements between the Defendants and the owners/managers of the Clinics, not pursuant to the documented and clinically-reasonable needs of the Insureds, or to benefit the Insureds who supposedly were subjected to it.

239.    In keeping with the fact that the Psych Testing was medically unnecessary, as set forth above, the vast majority of Insureds did not suffer from any clinically significant psychological symptoms nor any cognitive impairment as a result of their relatively minor accidents.

240.    Even if any of the Insureds did suffer clinically significant symptoms or impairment as a result of their putative accidents – which they did not – in a legitimate clinical setting, the psychiatric diagnostic evaluation is typically the only service necessary to formulate a diagnosis and treatment plan for individual Insureds with non-complex psychological cases. Conversely, as with the neurobehavioral status exams, Psych Testing is only indicated where a diagnosis and treatment plan is not capable of being developed at the conclusion of a psychiatric diagnostic evaluation, typically in complex psychological cases.

241.    In the claims for Psych Testing that are identified in Exhibit "2", few, if any, of the Insureds who purportedly were subjected to Psych Testing by the unlicensed "social workers", on behalf of the SLSP, presented with complex psychological symptoms. Rather, each Insured – to the extent that they suffered any clinically significant symptoms or impairment at all as a result of their putative automobile accidents – experienced an obvious precipitant (i.e., the underlying automobile accident) and developed the supposed symptoms or impairments in response to the accident. In straightforward, non-complex cases such as these, the clinical interview and mental status examination portions of the psychiatric diagnostic evaluation are generally sufficient mechanisms for gathering the patient data necessary to formulate an individualized diagnosis and treatment plan.

242.    In further keeping with the fact that the purported Psych Testing was medically unnecessary, the Psych Testing was performed, to the extent performed at all, pursuant to the Defendants' fraudulent treatment protocol and unlawful kickbacks and was not intended to elicit any information that would significantly affect the diagnosis or treatment of any Insured.

243.    For instance, the unlicensed "social workers", at the direction of the Management Defendants and on behalf of the SLSP, purported to provide an identical battery of Psych Testing

to virtually every Insured who treated with SLSP, without regard to any Insureds' individual circumstances or presentment.

244.    Specifically, as set forth above, for those Insureds who treated with SLSP, the unlicensed "social workers" purported to perform an SBI, BAI, BDI-2, BHS, PDI, PCL-5, HSQ, and PIPS, regardless of any Insured's individual symptoms and presentment.

245.    What is more, regardless of any Insured's test scores, SLSP provided each Insured with bogus diagnoses and the same boilerplate treatment plan.

246.    Finally, a "confounding variable" is an unmeasured third variable that influences, or confounds, the relationship between an independent and a dependent variable by suggesting the presence of a spurious correlation. For the results of psychological testing to be valid, all confounding variables must be accounted for and/or removed before the testing is conducted.

247.    Drug use and alcohol use are two examples of confounding variables. This is because drugs and alcohol are mind altering substances capable of suggesting the presence of psychological symptoms resulting from a traumatic event when in fact the psychological symptoms are simply a temporary byproduct of the substance use.

248.    In further keeping with the fact that the purported Psych Testing was medically unnecessary and not intended to elicit any information that would significantly affect the diagnosis or treatment of any Insured, in many cases in the claims identified in Exhibits "1" and "2", though the Insured purported to disclose recent drug and/or alcohol use during the psychiatric diagnostic evaluation, the unlicensed "social worker" purported to conduct the Psych Testing without, at minimum, accounting for the drug and/or alcohol use in the final analysis of the testing results, or, if necessary, requiring the Insured to return for testing after sufficiently detoxing.

        **(ii)**       **SLSP's misrepresentations Regarding the Amount of Time Spent on Psych Testing**

249.    Furthermore, charges for the Psych Testing that were submitted by the Defendants through SLSP to GEICO, as identified in Exhibit "2", were also fraudulent because, notwithstanding the misrepresentations that the Psych Testing virtually always took a total of six (6) hours to perform – the tests never took more than, at most, between (1) and two (2) hours to administer, score, and interpret, to the extent they were administered, scored, and interpreted in the first instance.

250.    For example, the Psych Testing virtually always consisted of nothing more than a packet of eight (8) pre-printed checklists, inventories, and/or scales that were automatically distributed to the Insureds by the front desk receptionists at the Clinics, and which the Insureds typically filled out before even meeting any of the unlicensed "social workers".

251.    Even if the Psych Testing was administered face-to-face by the unlicensed "social workers" – which it was not – the maximum amount of time typically needed to administer all eight (8) Psych Tests is just ninety (90) minutes.

252.    What is more, to the extent the billing for Psych Testing submitted through SLSP to GEICO purports to include time for "interpretation" and "report prep", virtually none of the reports submitted by the Defendants through SLSP contained any legitimate written interpretation or analysis of the Psych Testing results.

253.    For instance, as set forth above, though virtually all of the reports submitted through SLSP contained a section labelled "Impressions", the language in each "Impressions" section reflected no legitimate analysis of Psych Testing Results, but rather was merely the following boilerplate language:

Impressions: According to the preliminary results, [name of Insured] is suffering from emotional and behavioral problems in addition to physical outcomes of the accident. These symptoms are consequently and casually related to the accident on [date of underlying accident].

### (iii)   The Fraudulent Misrepresentations Regarding the Existence of Written, Interpretive Reports for the Psychological Testing

254.   Finally, the Defendants' charges for the Psychological Testing also are fraudulent in that the use of CPT codes 96116 and 96118 represents that the Defendants have prepared a legitimate written report interpreting the test results. Though the Defendants routinely billed for the Psychological Testing under CPT code codes 96116 and 96118, and though the Defendants submitted what they purport to be interpretive test reports in support of their billing, none of the unlicensed "social workers" or Defendants prepared any valid written reports interpreting the test results.

255.   Rather, virtually every "Psychological Report" submitted or caused to be submitted by the Defendants through the Lloyd Entity Defendants to GEICO in support of the respective Lloyd Entity Defendant's psychological testing charges merely contained the Insureds' putative test "scores" and a summary of answers or actual answers, a one-word interpretation (if any) of the putative test scores (i.e., "normal", "moderate", "mild"), a phony diagnosis purportedly based on the results of the psychological testing, and other boilerplate language.

256.   Then, per his arrangement with the Management Defendants, Lloyd's signature was affixed to the "reports".

### 4.   Tristate's "Unbundled" Charges

257.   Not only did the Defendants, through Tristate, submit improper billing for psychiatric diagnostic evaluations and neurobehavioral status exams through Tristate, they also

routinely "unbundled" the charges in order to maximize the billing they could submit, or cause to be submitted, through Tristate to GEICO.

258.    In particular, for virtually every Insured that treated with Tristate, in addition to submitting charges for a psychiatric diagnostic evaluation, the Defendants, also submitted separate charges through Tristate to GEICO for: (i) "psychiatric evaluation of medical records" under CPT code 90885, typically resulting in a separate charge of $67.24; and (ii) 20-30 minutes of individual psychotherapy under CPT code 90804, typically resulting in a separate charge of $76.88.

(i)    **Tristate's "Unbundled" Record Review Charges**

259.    The use of CPT code 90885 represents that a psychologist conducted a "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes." Lloyd, Grody, and the John Doe Defendants routinely submitted charges through Tristate to GEICO under CPT code 90885 falsely representing that a psychiatric evaluation of medical records was performed on the same date of service as the psychiatric diagnostic evaluation, despite the fact that review and evaluation of the Insureds' medical and psychological records was necessary to, and already was reimbursed as an element of, the Insured's purported psychiatric diagnostic evaluation. In other words, Lloyd, Grody, the John Doe Defendants, and Tristate cannot conduct and bill for a psychiatric diagnostic evaluation and then bill separately for the contemporaneous review of medical or psychological records.

260.    Furthermore, the Defendants charges through Tristate under CPT code 90885 for record review and evaluation misrepresented the performance of the service because neither

Lloyd nor and of the unlicensed "social workers" ever reviewed or evaluated any records to support the charges.

261.    The conclusion that neither Lloyd nor any of the unlicensed "social workers" ever reviewed any records to support the charges billed under CPT code 90885 is confirmed by the fact that the "Review of Medical Records" report accompanying Tristate's billing virtually never identified any specific records that were actually reviewed. Rather, without listing any actual records reviewed, the "Review of Medical Records" report simply indicated that, "[t]he review of medical records confirmed that the patient was subjected to a MVA" and then listed the "referring physician's" diagnoses.

**(ii)    Tristate's "Unbundled" Psychotherapy Charges**

262.    In addition, on the same date that Insureds in the claims identified in Exhibit "1" were purportedly subjected to a psychiatric diagnostic evaluation and a neurobehavioral status examination, the unlicensed "social workers", on behalf of Tristate, purported to provide those same Insureds with a 20–30-minute psychotherapy session, for which a charge was then submitted through Tristate to GEICO under CPT code 90804, typically resulting in a charge of $76.88 per Insured.

263.    In a legitimate clinical setting, a charge for psychotherapy should only be billed on the same date of service as a charge for a psychiatric diagnostic evaluation if the two services are significant and separately identifiable.

264.    Even so, as a matter of course, the Defendants, through Tristate, submitted a charge for a 20–30-minute psychotherapy session purportedly conducted on the same date of service as a psychiatric diagnostic evaluation, for which they also submitted a separate and independent charge, despite the fact that a separate and independent psychotherapy session was

never "significant and separately identifiable" from the purported contemporaneously-conducted psychiatric diagnostic evaluation.

265.    In keeping with the fact that a separate and independent psychotherapy session was never "significant and separately identifiable" from the purported contemporaneously-conducted psychiatric diagnostic evaluation, the only "therapy" purportedly provided on the relevant date of service was provided as part of the purported psychiatric diagnostic evaluation.

266.    For instance, the boilerplate "Initial Treatment Process Note" included in every Tristate psychiatric diagnostic evaluation report includes the following summary:

> A major aim of the [evaluation] session was to develop a therapeutic alliance between patient and therapist. **During the initial evaluation patient was provided with psychoeducation and supportive therapy**.

(Emphasis added).

### 5.    Fraudulent Billing for the "Social Workers" Who Were Neither Licensed, Supervised, nor Employed by the Lloyd Entity Defendants

267.    Defendants' scheme also included the submission of fraudulent claims in the name of the Lloyd Entity Defendants to GEICO seeking payment for services performed by the unlicensed "social workers" who were neither employed by either of the Lloyd Entity Defendants nor supervised by Lloyd or any licensed healthcare professional.

268.    Pursuant to New York Education Law §7605 Sect. 3(13), an individual with a Masters level degree in psychology or its equivalent can practice psychology, including performing psychological testing and counseling, so long as that individual is "working under the supervision of a licensed psychologist."

269.    In addition, under the New York No-Fault Law, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by

independent contractors – the healthcare services must be provided by the billing provider itself, or by its employees.

270.    The unlicensed "social workers" were not licensed psychologists, but rather held Masters level degrees in social work (at best). As a result, the No-Fault Law prohibited the Defendants from billing for or recovering No-Fault Benefits from GEICO or other New York automobile insurers for services provided by the unlicensed and unsupervised "social workers."

271.    As set forth above, the unlicensed "social workers" purported to perform nearly all, if not all, of the putative Fraudulent Services on behalf of the Lloyd Entity Defendants. In most cases, the unlicensed "social workers" purported to perform these services at the Clinics, and the services were then billed through one of the Lloyd Entity Defendants to GEICO under New York no-fault insurance policies.

272.    However, the unlicensed "social workers" were not supervised by Lloyd, nor by any other licensed psychologist or licensed healthcare provider, when they purported to perform the putative Fraudulent Services in all of the claims identified in Exhibits "1" and "2".

273.    To the contrary, a licensed psychologist was not even present at any of the Clinics when the unlicensed "social workers" would purport to perform the Fraudulent Services on behalf of the Lloyd Entity Defendants.

274.    Additionally, the unlicensed "social workers" were never employed by Lloyd or by either of the Lloyd Entity Defendants but all times were directed and controlled by Grody and other Managing Defendants.

275.    In virtually all of the claims identified in Exhibits "1" and "2", the Lloyd Entity Defendant's billing (i.e. the NF-3 forms) misrepresented that the Fraudulent Services were lawfully performed by Lloyd and that the respective Lloyd Entity Defendant was eligible for no-

fault reimbursement, when in fact neither Lloyd Entity Defendant was eligible for No-Fault benefits because the individuals who purportedly performed the Fraudulent Services were the unlicensed, unsupervised "social workers" who were not employed by either Lloyd Entity Defendant, as well as for the additional reasons set forth in this Complaint.

### III.   The Fraudulent Billing Defendants Submitted, or Caused to be Submitted, to GEICO

276.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted large volumes of NF-3 forms and supporting documentation through the Lloyd Entity Defendant to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

277.   The NF-3 forms, reports, assignment of benefits and other documents submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)   The NF-3 forms, letters, records, and other supporting documentation by the Defendants through the Lloyd Entity Defendants to GEICO uniformly misrepresented that Lloyd had performed the Fraudulent Services, that his name, license, and the tax identification numbers of the Lloyd Entity Defendants were being legitimately used to bill for the Fraudulent Services,  making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the Management Defendants unlawfully and secretly controlled, operated, and managed the Lloyd Entity Defendants;

(ii)   The NF-3 forms, letters, records, and other supporting documentation by the Defendants through the Lloyd Entity Defendants to GEICO uniformly misrepresented that the Defendants were in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were eligible to receive no-fault reimbursement in the first instance, when in fact they were not;

(iii)   The NF-3 forms, letters, records, and other supporting documentation by the Defendants through the Lloyd Entity Defendants to GEICO uniformly misrepresented that the Fraudulent Services were provided in compliance with all significant laws and regulations governing healthcare practice

and/or licensing laws and, therefore, were eligible for no-fault reimbursement in the first instance, when in fact they were not;

(iv)    The NF-3 forms, letters, records, and other supporting documentation by the Defendants through the Lloyd Entity Defendants to GEICO uniformly concealed that the Fraudulent Services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(v)    The NF-3 forms, letters, records, and other supporting documentation by the Defendants through the Lloyd Entity Defendants to GEICO uniformly misrepresented that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 despite the fact that the services were provided by unlicensed "social workers" who were not supervised by Lloyd or any other licensed healthcare practitioner and were not employed by Lloyd or either of the Lloyd Entity Defendants.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

278.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

279.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically made material misrepresentations, concealed their fraud and the underlying scheme, and went to great lengths to accomplish this concealment in the design and implementation of the scheme, the billing submitted to GEICO, and the collection efforts undertaken against GEICO.

280.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Lloyd in the performance of the Fraudulent Services, his lack of control and/or management of the Lloyd Entity Defendants, the fact that the patient referrals were derived through financial payments or other unlawful arrangements between the Management Defendants and the Clinics, as well as the fact that the Fraudulent Services were performed by unlicensed "social workers" that were neither supervised by Lloyd or any other

licensed healthcare practitioner and were not employed by Lloyd or either of the Lloyd Entity Defendants.

281.    Additionally, the Management Defendants entered into complex financial arrangements with John Doe Defendants, as well as with other third parties, that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

282.    Furthermore, the Defendants knowingly misrepresented and concealed facts related to the operation and the Lloyd Entity Defendants, in the fact that Lloyd did not have any financial ownership of the Lloyd Entity Defendants, and that the Management Defendants entered into arrangements with Funders, including Financial Vision, to sell the receivables associated with the billing to GEICO, and other New York automobile insurers, without the consent of Lloyd.

283.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were: (i) medically unnecessary and performed pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services; (ii) never performed in the first instance; and (iii) performed by unlicensed "social workers" that were not supervised by Lloyd or any other licensed healthcare professional and were not employed by either of the Lloyd Entity Defendants.

284.    The Collection Lawyers that associated with the Defendants pursued collection of the charges from GEICO. These law firms routinely filed expensive and time-consuming litigation against GEICO if the charges were not promptly paid in full.

285.    GEICO takes steps to timely respond to all claims and to ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and other fraudulent activity described above, were designed to, and did, cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $520,000.00 based on payments that were made in response to the fraudulent charges.

286.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover, and could not reasonably have discovered, that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Tristate and SLSP**
**(Declaratory Relief under 28 U.S.C. §§2201 and 2202)**

287.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

288.    There is an actual case and controversy between GEICO and Tristate and SLSP regarding more than $675,000.00 in pending billing submitted through Tristate and SLSP.

289.    Tristate and SLSP have no right to receive payment for any pending bills submitted to GEICO because the billed for services were submitted through psychology practices not legitimately owned or controlled by licensed psychologists, but which were unlawfully operated, managed, and controlled by the Management Defendants and Financial Vision for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

290.    Tristate and SLSP have no right to receive payment for any pending bills submitted to GEICO because the billed for services were not medically necessary and were performed – to the extent performed at all – pursuant to improper financial arrangements between the Management Defendants and the Clinics.

291.    Tristate and SLSP have no right to receive payment for any pending bills submitted to GEICO because the billed for services were not medically necessary and were performed – to the extent performed at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

292.    Tristate and SLSP have no right to receive payment from GEICO on the unpaid billing because the billing submitted to GEICO for the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

293.    Tristate and SLSP have no right to receive payment from GEICO for any pending bills because the psychological services that were billed through Tristate and SLSP were provided by unsupervised "social workers" who were not employed by Lloyd or either of the Lloyd Entity Defendants, in contravention of New York law.

294.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Tristate and SLSP have no right to receive payment for any pending bills submitted to GEICO.

<u>**SECOND CAUSE OF ACTION**</u>
**Against Grody and Lloyd**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

295.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

296.    Tristate is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

297.    Grody and Lloyd knowingly have conducted and/or participated, directly or indirectly, in the conduct of Tristate's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that Tristate was not eligible to receive under the New York no-fault insurance law because: (i) the billed for services were submitted through a psychology practice not legitimately owned, operated, or controlled by a licensed psychologist, but which was unlawfully operated, managed, and controlled by the Grody and the John Doe Defendants for the purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Grody and the John Doe Defendants and the Clinics; (iii) the billed for services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented that Lloyd performed the services, on behalf of Tristate; (v) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (vi) the Fraudulent Services were provided, to the extent provided at all, by unsupervised "social workers" who were not employed

by either Lloyd or Tristate, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

298.    Tristate's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Grody and Lloyd operated Tristate, insofar as Tristate is not engaged in a legitimate psychology practice, and acts of mail fraud therefore are essential in order for Tristate to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Grody and Lloyd continue to attempt to collect on the fraudulent billing submitted through Tristate to the present day.

299.    Tristate is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Tristate in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

300.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $128,000.00 pursuant to the fraudulent bills submitted through Tristate.

301.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Lloyd, Grody, and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

302.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

303.    Tristate is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

304.    Lloyd, Grody, and the John Doe Defendants are employed by and/or associated with Tristate. Lloyd, Grody, and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Tristate's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Tristate was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a psychology practice not legitimately owned, operated, or controlled by a licensed psychologist, but which was unlawfully operated, managed, and controlled by the Grody and the John Doe Defendants for the purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Grody and the John Doe Defendants and the Clinics; (iii) the billed for services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions

seeking payment for the billed for services uniformly misrepresented that Lloyd performed the services, on behalf of Tristate; (v) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (vi) the Fraudulent Services were provided, to the extent provided at all, by unsupervised "social workers" who were not employed by either Lloyd or Tristate, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

305.    Lloyd, Grody, and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

306.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $128,000.00 pursuant to the fraudulent bills submitted by Defendants through Tristate.

307.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Tristate, Lloyd, and Grody**
**(Common Law Fraud)**

308.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

309.    Tristate, Lloyd, and Grody intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

310.    The false and fraudulent statements of material fact and acts of fraudulent concealment include the representation that: (i) the billed for services were submitted through a psychology practice that was legitimately owned, operated, or controlled by a licensed psychologist, when they were not; (ii) the billed for services were provided based upon legitimate decisions by licensed healthcare providers, when they were the result of illegal financial arrangements between Grody and the Clinics; (iii) the billed for services were medically necessary and were provided, when – to the extent provided at all – they were pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the Fraudulent Services were performed by Lloyd, on behalf of Tristate, when they were performed by unlicensed "social workers" who were not supervised by a licensed psychologist; (v) the billed for services were actually provided by Lloyd, on behalf of Tristate, when the billed for services exaggerated what was actually provided to the Insureds; and (vi) the Fraudulent Services were provided in compliance with New York law, when they were not.

311.    Tristate, Lloyd, and Grody intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tristate that were not compensable under New York no-fault insurance laws.

312.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $128,000.00 pursuant to the fraudulent bills submitted by the Defendants through Tristate.

313.    Tristate, Lloyd, and Grody extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

314.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Tristate, Lloyd, and Grody**
**(Unjust Enrichment)**

315.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

316.    As set forth above, Tristate, Lloyd, and Grody engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

317.    When GEICO paid the bills and charges submitted by or on behalf of Tristate for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Tristate, Lloyd, and Grody's improper, unlawful, and/or unjust acts.

318.    Tristate, Lloyd, and Grody have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Tristate, Lloyd, and Grody voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

319.    Tristate, Lloyd, and Grody's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

320.    By reason of the above, Tristate, Lloyd, and Grody have been unjustly enriched in an amount to be determined at trial, but in no event less than $128,000.00.

**SIXTH CAUSE OF ACTION**
**Against Grody, Lloyd, N. Tariverdiev, K. Tariverdiev,**
**Stoyanovsky, Khavko, Islamov, and Pakoys**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

321.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

322.    SLSP is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

323.    Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys knowingly have conducted and/or participated, directly or indirectly, in the conduct of SLSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis since its inception seeking payments that SLSP was not eligible to receive under the New York no-fault insurance law because: (i) the billed for services were submitted through a psychology practice not legitimately owned, operated, or controlled by a licensed psychologist, but which was unlawfully operated, managed, and controlled by the Management Defendants for the purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Management Defendants

and the Clinics; (iii) the billed for services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented that Lloyd performed the services, on behalf of the SLSP; (v) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (vi) the Fraudulent Services were provided, to the extent provided at all, by unsupervised "social workers" who were not employed by either Lloyd or the SLSP, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

324.    SLSP's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys operated SLSP, insofar as SLSP is not engaged in a legitimate psychology practice, and acts of mail fraud therefore are essential in order for SLSP to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys continue to attempt to collect on the fraudulent billing submitted through SLSP to the present day.

325.    SLSP is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently

unlawful acts are taken by SLSP in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

326.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $391,000.00 pursuant to the fraudulent bills submitted through SLSP.

327.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
**Against Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, Financial Vision, and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

328.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

329.    SLSP is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

330.    Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, Financial Vision, and the John Doe Defendants are employed by and/or associated with SLSP. Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, Financial Vision, and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of SLSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that SLSP was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a psychology practice

not legitimately owned, operated, or controlled by a licensed psychologist, but which was unlawfully operated, managed, and controlled by the Management Defendants for the purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Management Defendants and the Clinics; (iii) the billed for services were not medically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented that Lloyd performed the services, on behalf of the SLSP; (v) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (vi) the Fraudulent Services were provided, to the extent provided at all, by unsupervised "social workers" who were not employed by either Lloyd or the SLSP, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

331.    Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, Financial Vision, and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

332.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $391,000.00 pursuant to the fraudulent bills submitted by Defendants through SLSP.

333.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys
### (Common Law Fraud)

334.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

335.    SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

336.    The false and fraudulent statements of material fact and acts of fraudulent concealment include the representation that: (i) the billed for services were submitted through a psychology practice that was legitimately owned, operated, or controlled by a licensed psychologist, when they were not; (ii) the billed for services were provided based upon legitimate decisions by licensed healthcare providers, when they were the result of illegal financial arrangements between the Management Defendants and the Clinics; (iii) the billed for services were medically necessary and were provided, when – to the extent provided at all – they were pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the

Fraudulent Services were performed by Lloyd, on behalf of SLSP, when they were performed by unlicensed "social workers" who were not supervised by a licensed psychologist; (v) the billed for services were actually provided by Lloyd, on behalf of SLSP, when the billed for services exaggerated what was actually provided to the Insureds; and (vi) the Fraudulent Services were provided in compliance with New York law, when they were not.

337.    SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through SLSP that were not compensable under New York no-fault insurance laws.

338.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $391,000.00 pursuant to the fraudulent bills submitted by the Defendants through SLSP.

339.    SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

340.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Financial Vision**
**(Aiding and Abetting Fraud)**

341.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

342.    Financial Vision knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys.

343.    The acts of Financial Vision in furtherance of the fraudulent scheme described herein included, among other things: (i) associating with the Management Defendants to falsely create the appearance that Financial Vision provided legitimate goods and/or services to Lloyd and the SLSP; and (ii) providing money to the Management Defendants to further the fraudulent scheme through the SLSP in exchange for obtaining the profits from the SLSP's submission of No-Fault bills to GEICO, and other automobile insurers.

344.    The conduct of Financial Vision in furtherance of the fraudulent scheme was significant and material.  The conduct was a necessary part of and was critical to the success of the overall fraudulent scheme because, without their participation and their actions, Lloyd and the Management Defendants would not have been able to: (i) conceal the identities and participation of unlicensed laypersons in the fraudulent scheme; (ii) funnel monies to unlicensed laypersons and entities and pay expenses to fund the fraudulent scheme, including payments to access the Clinics and payments to the unlicensed "social workers".

345.    Financial Vision aided and abetted the fraudulent scheme in a calculated effort to allow the Management Defendants, and other unlicensed laypersons to participate and profit from the fraudulent scheme and pay the expenses to fund the scheme.

346.    The conduct of Financial Vision caused GEICO to pay more than $391,000.00 pursuant to the fraudulent bills and other supporting documentation that were submitted to GEICO by or on behalf of the SLSP.

347. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

348. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev,**
**Stoyanovsky, Khavko, Islamov, Pakoys, and Financial Vision**
**(Unjust Enrichment)**

349. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

350. As set forth above, SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, and Financial Vision engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

351. When GEICO paid the bills and charges submitted by or on behalf of SLSP for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, and Financial Vision's improper, unlawful, and/or unjust acts.

352. SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, and Financial Vision have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, and Financial Vision voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

353.     SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, and Financial Vision' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

354.     By reason of the above, SLSP, Grody, Lloyd, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, and Financial Vision have been unjustly enriched in an amount to be determined at trial, but in no event less than $391,000.00.

## JURY DEMAND

355.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against the Tristate and SLSP, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Tristate and SLSP have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Grody and Lloyd, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $128,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Lloyd, Grody, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $128,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Tristate, Lloyd, and Grody, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $128,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Tristate, Lloyd, and Grody for more than $128,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Lloyd, Grody, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $391,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Lloyd, Grody, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, Financial Vision, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $391,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against SLSP, Lloyd, Grody, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, and Pakoys, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $391,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Financial Vision compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $391,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper; and

J.      On the Tenth Cause of Action against SLSP, Lloyd, Grody, N. Tariverdiev, K. Tariverdiev, Stoyanovsky, Khavko, Islamov, Pakoys, and Financial Vision for more than $391,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper.

Dated: August 12, 2024

                                        RIVKIN RADLER LLP

                                        By:   /s/ Barry I. Levy
                                              Barry I. Levy, Esq.
                                              Michael Vanunu, Esq.
                                              Alexandra Wolff, Esq.
                                        926 RXR Plaza
                                        Uniondale, New York 11556
                                        (516) 357-3000

                                        *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*

4883-5136-6870, v. 2